**Wayne Blyth HEALY, Petitioner**

v.

**Luis SPENCER, et al Respondents**

**No. CIV.A.03–30031–MAP.**

United States District Court,
D. Massachusetts.

Nov. 8, 2005.

---

David M. Lieber, Assistant Attorney General, Boston, MA, for Luis Spencer, Thomas F. Reilly, Respondents.

Natalie S Monroe, Attorney General's Office, Boston, MA, for Luis Spencer, Thomas F. Reilly, Respondents.

Wendy Sibbison, Greenfield, MA, for Wayne Blyth Healy, Petitioner.

*MEMORANDUM REGARDING RE-PORT AND RECOMMENDATION ON PETITION FOR WRIT OF HA-BEAS CORPUS AND MOTION FOR AN EVIDENTIARY HEARING* (Dkt. Nos. 1 and 19)

PONSOR, District Judge.

## I. *INTRODUCTION*

*Habeas corpus* petitioner Wayne Blyth Healy ("Healy" or "Petitioner") contends that he has been wrongly imprisoned following his conviction on one count of first-degree murder. His arguments can be divided into three categories: (1) that the prosecution's failure to disclose material, exculpatory evidence violated his rights as set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) that he is entitled to an evidentiary hearing to develop his claim that the jury

foreman was improperly influenced; and (3) that there was insufficient evidence to support his conviction. Citing *Terry Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000),[1] and *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), Respondents Luis Spencer and Thomas F. Reily ("Respondent"[2] or "the Commonwealth") assert that Petitioner's *habeas* claims should be denied because the state court's adjudication involved neither an unreasonable application of clearly established federal law nor an unreasonable conclusion that the evidence, when taken in the light most favorable to the prosecution, was sufficient to support the jury's verdict. Furthermore, Respondent contends that permitting an evidentiary hearing would be improper in light of Petitioner's lack of diligence in pursuing a jury taint claim in state court. *See Michael Williams v. Taylor*, 529 U.S. 420, 435, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). *See supra* note 1.

This matter was referred to Magistrate Judge Kenneth P. Neiman, who recommended that *habeas corpus* relief be granted with respect to Petitioner's *Brady* claim, that Petitioner's motion for an evidentiary hearing be allowed, and that relief be denied, without prejudice, with respect to Petitioner's insufficiency of evidence contention. For the reasons set forth below, the court will adopt this recommendation with respect to Healy's *Brady* claim and request for an evidentiary hearing. However, because sufficiency-of-the-evidence review concerns only the evidence adduced at trial, *United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), the court will deny *habeas* relief with prejudice with respect to that claim.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *Healy I.*

#### 1. *The Crime.*

In its opinion addressing Petitioner's direct appeal, *Commonwealth v. Healy*, 393 Mass. 367, 471 N.E.2d 359 (1984) ("*Healy I* "), the Massachusetts Supreme Judicial Court ("SJC") offered the following summary of "the evidence submitted by the Commonwealth." *Id.* at 363.[3]

---

1. The court is including the party's given name along with his surname in light of the fact that it will be discussing two Supreme Court decisions both with the names *Williams v. Taylor*.

2. This court will follow the lead of the Commonwealth, which, in its memoranda, has consistently referred to Superintendent Spencer as the lone respondent. (*See, e.g.*, Dkt. No. 57, Resp't's Opp'n Writ Pet.; Dkt. No. 70, Resp't's Objections to Report & Recommendation.)

3. The Commonwealth argues that pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") this summary constitutes presumptively correct factual findings that can only be rebutted "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2005). Because Petitioner offers no such evidence, Respondent contends that it would

be inappropriate for this court to revisit conflicts in the trial evidence. (*See* Dkt. No. 57, Resp't's Opp'n Writ Pet. 11–13; Dkt. No. 70, Resp't's Objections to Report & Recommendation 13–18.) In a typical *habeas* case, of course, Respondent's argument would be correct. In a case such as this, however, where a petitioner alleges that but for the prosecution's suppression of exculpatory evidence the jury might well have weighed the evidence differently, the analytical approach must be somewhat different. As will be discussed more fully below, the task of this court is to determine what effect the inclusion of the suppressed exculpatory evidence would have had on the outcome of the trial. *See Strickler v. Greene*, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). To perform this task properly, this court must, to some degree, take note of facts outside the state court's summary of the record.

Between 1 and 1:30 A.M. on August 8, 1980, the victim, Richard Frank Chalue, was heard screaming for help from inside his apartment in Holyoke. Chalue's body was found on his bed shortly before 2 A.M. He had been stabbed fourteen times in the chest, once on either side of the neck, and once on his right thigh. There was also a laceration on his left index finger. His hands had been bound behind him with socks tied together, and he had a gag of socks tied around his mouth. He was naked except for a towel wrapped around his neck and a pair of dungarees half-way down his legs. A pair of boots tied together with socks lay on the floor at the foot of the bed. On the table in the kitchen were a partially empty bottle of rum, two bottles of cola, one of which was partially empty, a glass, and an ashtray containing cigarette butts. The apartment was dark, since there was no electricity as a result of a fire in the building the week before. The victim's Doberman pinscher dog was locked in another room of the apartment. Both the front and the back doors were locked, the front door having been locked with a key from the outside.

*Id.*

2. *The Investigation.*

"Since the fire," the Commonwealth's evidence indicated that,

the victim had been staying alone in the apartment, with the dog guarding his possessions. His girlfriend and her two children, with whom he had shared the apartment for the last three years, were staying with her mother in her mother's apartment in a neighboring building. The victim, his girlfriend, and the children were to have moved to a new apartment on August 8. On the evening of August 7, the victim had supper with his girlfriend and the children in her

mother's apartment and then took the children to a park. They returned at about 7:30 P.M., and he left at about 8:20 P.M. At about 9:15 P.M. his girlfriend telephoned Chalue's apartment. There was no answer. She called back twice in rapid succession. Chalue answered the third time, sounding as though he had been running and was out of breath. He said that he had been downstairs at the apartment of a neighbor. Then she heard someone walk into the kitchen and say something to Chalue, and she heard them both laugh. She testified that it was the "very soft voice" of a man. Then Chalue became silent. She asked him who was with him. Finally, he answered that it was "Johnny," the neighbor from downstairs. She asked him several times whether everything was all right. He kept responding, "[S]ure, why wouldn't it be?" Johnny Arel testified at trial that he was not in Chalue's apartment, or indeed in the building, on the night in question.

Johnny's brother, Leo, who was staying in the fourth-floor apartment directly below Chalue's, testified that between 9 and 10 P.M. he heard someone going up the stairs; he went out to investigate, and spoke with Chalue, who was outside his own apartment and not within Leo's view. Leo then heard Chalue's front door close. Between midnight and 1 A.M. on August 8 he heard noises in Chalue's apartment as though furniture were being moved. A short time later he heard noises in the hallway and on the stairs outside his front door. When he turned off his radio and approached the door, the noise stopped. Leo was carrying a lantern, and its light was visible through his front door's transom. He heard the noise again twice, and, when he turned the radio off or approached the door, the noise stopped. A

short time after the last noise, he heard the police cruisers arrive.

A cash register receipt for rum, cola, and ice was found, stained with blood, on the third-floor landing of the front stairs. The Commonwealth's fingerprint expert testified that he had found [Petitioner's] fingerprints on the bottle of rum and on the partially empty bottle of cola. The Commonwealth's expert serologist testified that his tests indicated that four cigarette butts which had been taken from the ashtray on the victim's kitchen table had been smoked by someone who was a "non-secretor," i.e., who did not secrete blood group substances in his saliva. According to the expert's testimony, 20% of the population is composed of non-secretors. A test of [Petitioner's] saliva showed that he was a non-secretor. Further, one of the four cigarette butts was found to contain cell material from a person with group B blood. [Petitioner] has group B blood. According to the Commonwealth's expert, 2% of the population are non-secretors and have group B blood.

A bloodstained knife was found on the dresser in Chalue's bedroom. The Commonwealth's expert serologist also testified that tests performed on the blood on the knife showed it to contain A and B antigens, which would be consistent with the blood being a mixture of blood of group A and blood of group B. The victim's blood type was group A. Similarly, a long-sleeved shirt found in a search of [Petitioner's] apartment had a bloodstain containing both A and B antigens. Finally, group B blood was found on the gear shift and brake lever of [Petitioner's] automobile.

When the police officers questioned [Petitioner] on the evening of August 8, he had a bandage on the palm of his right hand. The doctor who sutured the wound at about 8:20 A.M. on August 8 testified that in his opinion the wound had been between four and twenty-four hours old at the time he treated it. He testified that the wound could have been caused by the knife found in the victim's bedroom.

On August 8 at about 6:15 P.M. William McCarthy, captain of detectives with the Holyoke police department, dialed [Petitioner's] telephone number, which he had found in the victim's address book next to the initials "W.H." [Petitioner] told McCarthy that it had been three or four months since he had last seen the victim, who had once been married to [Petitioner's] sister. He said that he had had a telephone call from Chalue at about 7 P.M. the evening before, inviting him to a "get-together," but that he had declined the invitation because he had other plans for the evening. McCarthy asked Healy if he would come to the police station sometime to talk with the police officers and possibly to help them in the case. Healy made an appointment to meet with McCarthy at the police station on the following day. About twenty minutes later [Petitioner] called McCarthy to ask whether he could come down to the station that evening, saying that he did not think he would be able to sleep that night "thinking about this." McCarthy agreed to the change.

. . . .

[Petitioner] was accompanied to the police station by his roommate, George Roy. [Petitioner] was ushered into McCarthy's office, and Roy was asked to wait outside. McCarthy began the interview by asking [Petitioner] the names of the victim's friends, what bars and cafes the victim had frequented, and related questions. Then [Petitioner] made the statement that he had taken Chalue the rum and cola, had spoken to him

outside, and had returned home at about 10:15 P.M. McCarthy pointed out that this statement contradicted what Healy had told him on the telephone. Healy responded that he had not gone to the apartment and that McCarthy could verify that he arrived home at 10:15 P.M. by asking Roy. When McCarthy went out of the room to question him, Roy stated that on the way to the police station he and [Petitioner] had agreed to say that [Petitioner] got home at about 10:15 P.M., but that it actually could have been 12:30 A.M.

*Id.* at 363–365 (footnotes omitted).

Later in the interview, [Petitioner] told the police officers that after leaving Chalue he had gone to two "gay" bars in Springfield and had arrived home shortly after midnight. When asked by the police officers, he stated that he was a homosexual.

*Id.* at 365.

Also on August 8th, Dr. Paul Wakefield performed an autopsy on the victim. In a four-page report entitled, "Holyoke Hospital Pathology Department Post–Mortem Examination" ("postmortem report"), Dr. Wakefield stated that the victim's genitalia were "examined closely" and that "no evidence of marks of recent origin" were found. (Dkt. No. 10, Ex. 11, Def.'s Am. Mot. New Trial, Ex. B *1.) A similar examination of the rectum revealed "no abnormal findings on the external surface." (*Id.*) Dr. Wakefield also noted that "[s]mears [were] made by use of a swab from both the mouth as well as rectum to be examined under the microscope." (*Id.*)

Two days later, on August 10th, Dr. Wakefield authored a handwritten note ("note"), which indicated the results of the microscopic examination: "Smears made from mouth and rectum fail to reveal spermatozoa present." (Dkt. No. 10, Ex. 11, Def.'s Am. Mot. New Trial, Ex. C *1.)

In a two-page "Autopsy Report" dated November 28, 1980, Dr. Wakefield included a subheading entitled, "Final Diagnosis" ("final diagnosis"). This report explained the cause of death, but neglected to mention Dr. Wakefield's findings regarding the victim's rectum and genitalia, the use of any swabs or smears, or the results of the microscopic examination. (Dkt. No. 10, Ex. 11, Def.'s Am. Mot. New Trial, Ex. D *4.)

After a Hampden county grand jury returned a single indictment charging Petitioner with murder on September 11, 1980, Petitioner's counsel moved to have the prosecutor provide him with all autopsy-related records and disclose any facts of an exculpatory nature. (Dkt. No. 10, Ex. 17, Super. Ct. Findings, Rulings, & Order 6, May 8, 2001.) The district attorney's office turned over the final diagnosis, but did not produce Dr. Wakefiled's postmortem report or the note. (*Id.*).

### 3. *The Trial.*

#### a. *Evidence Relating to Homosexuality.*

Petitioner's jury trial began on March 11, 1981. On March 3rd, during a motion to suppress hearing, the prosecutor asked Healy's roommate, George Roy, to describe his relationship with Petitioner. (Dkt. No. 24, Tr. Hr'g Mot. Suppress 179:18–19, 182:19–20.) When Roy responded that they were "[v]ery good friends" (*id.* at 182:21), the prosecutor asked Roy whether he and Healy "share[d] the same bed," (*id.* at 183:14). At first, Roy stated that they did, but sought to explain this sleeping arrangement as an accommodation to Petitioner's aunt, who had moved in with them. (*Id.* at 190:3–5.) However, when the prosecutor subsequently asked whether Roy and Healy were lovers (and the court ordered the

witness to answer the question),[4] Roy admitted that they were and stated that this was the primary reason they slept together. (*Id.* at 192:2–6, 16–20.) Petitioner's trial counsel objected when the prosecutor proceeded to ask whether Roy had "engaged in sexual relations with Mr. Healy," and the court sustained the objection. (*Id.* at 193:18–22.) During his cross-examination, Roy maintained that the reason he and Healy agreed to lie to the police about the time Petitioner returned home was to protect Roy's status as a "closet" homosexual. (*Id.* at 194–95.)

Two days later, during a bench conference in the process of picking a jury, the prosecutor made known his intention to "introduce certain photographs of the deceased" (Dkt. No. 26, Tr. Hr'g 398:23) in order to allow jurors to infer that "it was a homosexual related murder," (*id.* at 399:5–6). "[I]f in fact [Petitioner] is homosexual," the prosecutor told the judge, and the jurors "draw some connection between the two, I think they have a right to do that." (*Id.* at 399:6–9.)

On the first day of the trial, when the prosecutor did introduce several such photographs, Petitioner's trial counsel argued that they were being used "to suggest to the jurors that there was some type of homosexuality involved in this particular murder and there really is no evidence of that." (Dkt. No. 30, Trial Tr. 887:21–23.) The state trial judge overruled the objection and permitted the jurors to see the pictures, including one which showed "the victim lying on his stomach with his hands tied behind his back." (*Id.* at 892:5–6.)[5] The prosecutor subsequently introduced "a pair of underwear found on the top of the dresser in the Chalue apartment which had stains on it which appeared to be blood." (*Id.* at 927:4–6.) Later expert testimony indicated that the underwear contained "seminal fluid or semen in the fly area" consistent with the victim's blood type. (Dkt. No. 35, Trial Tr. 1723:17–19, 1724:4–5, Mar. 18, 1981.)

4. During a bench conference, the court expressed concern over whether the prosecutor intended to "go after" Roy "about the specific alleged crimes he may have committed with [Petitioner], like unnatural acts." (Dkt. No. 24, Tr. Hr'g Mot. Suppress 188:9–13.) When the prosecutor suggested that the judge ask Roy "if he ever had sexual relations with [Healy]" (*id.* at 188:14–15), Petitioner's trial counsel stated that Roy "may even have a right to have counsel present when he testifies," (*id.* at 189:4–5). Such concern seems to have stemmed from an awareness of Mass. Gen. L. ch. 272, § 34 (punishing "the abominable and detestable crime against nature ... by imprisonment in state prison for not more than twenty years"). According to several commentators this "statute was arguably invalidated as applied to private consensual conduct" in 1974—seven years before the Healy trial. *See* Harvard Law Review Ass'n, *Gay Men and Lesbians in the Criminal Justice System*, 102 Harv. L.Rev. 1519, 1519 n. 2 (1989) (citing *Commonwealth v. Balthazar*, 366 Mass. 298, 318 N.E.2d 478, 481 (1974)), which found a companion statute criminaliz-

ing "lewd and lascivious acts" unconstitutional as applied to private, consensual adult behavior; *see also* Ellen Ann Anderson, *The Stages of Sodomy Reform*, 23 T. Marshall L.Rev. 283, 283 (1998) (calling the legal status of Massachusetts' sodomy statute in 1998 "somewhat ambiguous"). It bears noting, however, that the unconstitutionality of Mass. Gen. L. ch. 272, § 34, as applied to consenting adults in private, was not unambiguously recognized until 2002. *See Gay & Lesbian Advocates & Defenders v. Attorney Gen.*, 436 Mass. 132, 763 N.E.2d 38, 40 (2002) (clarifying in dictum that *Balthazar* "extend[s] to § 34, as well").

5. The prosecutor stated that the photographer placed the victim's body in this position in order to capture the way in which the victim's hands had been bound. (Dkt. No. 30, Trial Tr. 891:12–13, 892:12–15.) According to Petitioner's trial counsel, this picture, which revealed the victim's "rectum and his testicles," was "offered by the Commonwealth to suggest sodomy and homosexuality." (*Id.* at 892:6–8.)

The next day, March 12th, featured testimony from Charlene Breault, the victim's neighbor and sister of the victim's girlfriend. Breault told jurors that only a few days before his death, the victim had answered his door while "zipping up his pants" after making her wait approximately ten minutes. (Dkt. No. 31, Trial Tr. 1040:9, 1042:14–16.) In addition, Breault stated that the victim had recently become irritated with her for passing through his apartment to get to hers.[6] (*Id.* at 1040:11–12)

Later on March 12th, the prosecutor called Holly Bendickson, the victim's girlfriend, who testified that the victim's personality had begun to change several months before his death. (*Id.* at 1084:17–20.) On the morning of the murder, Bendickson testified that she knocked on the victim's back door. (*Id.* at 1085:12–16.) When he did not respond, she looked through the bedroom window and saw a reflection of the victim's bare legs on his bed. (*Id.* at 1088:5–11.) Soon afterwards, she heard the front door open and close. (*Id.* at 1103:11–13.) When the victim finally arrived at the back door ten or fifteen minutes later, he refused to acknowledge that he had been in bed, but instead claimed to have been sleeping "dressed up . . . on the couch." (*Id.* at 1089:10–12, 22–23.)[7]

Bendickson also testified that during a phone conversation with the victim on the night of the murder, she heard a man with a "very soft voice" enter the victim's kitchen and laugh. When Bendickson asked who it was, the victim "went silent" and did not respond until she repeatedly asked, "Frank, are you there, Frank, are you there?" (*Id.* at 1124–28.)

On March 16th, Captain McCarthy testified that at the close of his interrogation on August 8, 1980, Petitioner claimed that after he left the victim he went "to Springfield to visit a couple of gay bars." (Dkt. No. 33, Trial Tr. 1292:3–4.) McCarthy added that, when another detective asked Petitioner "if he was in fact a homosexual," Petitioner said that he was. (*Id.* at 1292:21–23, 1293:1.)

The Commonwealth rested on March 19th, and the next day, Petitioner took the stand. During his testimony that day, the prosecutor objected when defense counsel attempted to introduce the jeans Petitioner had been wearing on the night of the murder. (Dkt. No. 37, Trial Tr.2004:7–8, 18–21.) At a subsequent bench conference, defense counsel explained that the unbloodied condition of the jeans suggested Petitioner was not the perpetrator of this very bloody crime. In response, the prosecutor stated: "He was nude when he did it is going to be our theory." (*Id.* at

---

6. During a bench conference, the prosecutor did not dispute the suggestion that the purpose of this testimony was to provide additional circumstantial evidence suggesting that the victim was a homosexual. (Dkt. No. 31, Trial Tr. 1031–34.)

7. During a *voir dire* hearing, Bendickson stated that six months prior to his murder the victim told her "that he didn't think he could please [a] woman because at one time in his life his five brothers had raped him." (Dkt. No. 31, Trial Tr. 1096:1–4.) Afterwards, Bendickson said, the victim's "mood changed," and they "didn't make love as often any-

more." (*Id.* at 1097:1–2.) According to the prosecutor, this evidence indicated that the victim's "sexual preference . . . seemed to change and . . . that he had questions about his sexual identity." (*Id.* at 1098:6–9.) Such evidence was "very relevant," he argued, in light of the physical evidence found at the crime scene and the fact that Healy "is a homosexual." (*Id.* at 1100:16–21, 1099:19–20.) "I just don't see that leap," said the state trial judge, refusing to allow in evidence concerning the deterioration of the couple's sexual relationship. (*Id.* at 1100:15, 1102:6–7.)

2005:6–7.) The trial judge allowed the jeans to be marked for identification. (*Id.* at 2009:11–12.)

During his direct examination, Petitioner repeated the story he eventually told the police, i.e., after leaving the victim at approximately 10:05 P.M., he visited two gay bars, then returned home at approximately 12:15 a.m. to his housemate and lover, George Roy. (*Id.* at 2066–86.) For his part, Roy testified that he observed nothing unusual about Petitioner's appearance or demeanor when he returned home and that the cut on Petitioner's hand came from an accident in the kitchen sink the morning after the murder. (Dkt. No. 40, Trial Tr. 2538–40, 2543:7–15.) Both men testified that the fear of having the nature of their relationship become public led them initially to misstate the time Petitioner returned home. (*See* Dkt. No. 38, Trial Tr. 2180:4–18, Mar. 24, 1981 (Petitioner testified that "it wasn't common knowledge that George and I were gay" and that Roy and he agreed not to mention Petitioner's trip to the gay bars for the good of their respective careers.); Dkt. No. 40, Trial Tr. 2584:15–23, Mar. 26, 1981 (Roy testified that he was "a closet case" homosexual, whose fear of having his sexual identity known led him to tell the Petitioner, "You can't just go down [to the police station] and answer questions and say you were at gay bars.").) [8]

The prosecutor, in cross-examining Petitioner and Roy, repeatedly probed the nature of their relationship and the consistency with which they concealed their sexual identities. For example, on March 24th, after eliciting testimony that Roy had been Petitioner's lover for four years (Dkt. No. 38, Trial Tr. 2248:18–23, 2249:1–3), the prosecutor used that information to suggest that it was Roy's love for Petitioner—rather than his fear of having his homosexuality become public—that led him to lie about Petitioner's whereabouts on the night of the murder, (*id.* at 2266:11–17, 2267:1–2 ("You're asking George Roy [to lie], [who] you've indicated has been your lover for four years . . . ?")). Two days later, when cross-examining Roy, the prosecutor asked a series of questions about his attendance and activities at gay bars to suggest he was not the "closet case" he claimed to be. (*See* Dkt. No. 40, Trial Tr. 2639–51 ("[Mr. Roy], were you hiding your homosexuality when you were dancing with a man in the [gay] bar?").)

At the same time, many of the prosecutor's questions seemed to go beyond conventional efforts to demonstrate bias or undermine credibility. For example, the prosecutor repeatedly asked Petitioner and Roy whether they slept in the same bed. (*See* Dkt. No. 39, Trial Tr. 2317:23, 2318:1–5 ("[T]here's a double bed in that room, isn't that right? . . . And George Roy sleeps with you every evening? . . . And has for four years?"); *id.* at 2319:13–19, 2320:2–3 ("Was [your aunt] aware of the fact that you [and Roy] slept in the same bedroom? . . . And you didn't alternate [—] sleep on the couch one night and in that bedroom the other night? . . . Was it the usual set of circumstances, sir, for you to sleep with Mr. Roy in that bedroom?"); Dkt. No. 40, Trial Tr. 2629:16–19, 2630:4 ("Did [Petitioner's aunt] know where you slept at night, [Mr. Roy]? . . .

---

8. This concern about prejudice, especially in 1980, was neither uncommon nor ill founded. *See* Abbe Smith, *The Complex Uses of Sexual Orientation in Criminal Court*, 11 Am. U.J. Gender Soc. Pol'y & L. 101, 105–06 (2002) (discussing the 1985 case of a North Carolina woman who concealed her homosexuality to avoid jury bias); *see also id.* at 108 n. 35 (noting more recent cases in which attorneys have "created around gayness a nimbus of culpability") (citation omitted).

Did she know where Mr. Healy slept? ... Was she aware you slept together, sir?"); *id.* at 2672:13–14 ("[Mr. Roy] is it fair to say you slept with [Petitioner] every night throughout this trial?"); *id.* at 2687:9 ("[Mr. Roy, have you] [g]one to bed with [Petitioner] through [the last two and one half years]?").) [9]

In addition, the prosecutor: (1) asked Petitioner if he knew the victim was bisexual (Dkt. No. 38, Trial Tr. 2297:8–9); (2) asked Roy if, during his relationship with Petitioner, he had "gone to bed with any other men" (Dkt. No. 40, Trial Tr. 2687:11); and (3) attempted unsuccessfully to introduce one of Petitioner's tee-shirts, which said "Sex Instructor, First Lesson Free," (Dkt. No. 39, Trial Tr. 2452–56).

During closing argument On April 2, 1980, Petitioner's counsel stated: "Wayne Healy testified ... he was wearing a pair of dungarees, a blue short-sleeved shirt ... and sandals.... The police ... [found] no blood whatsoever on the clothes that Mr. Healy was wearing that night, none whatsoever." (Dkt. No. 44, Trial Tr. 3250:14–19, 3251:3–5.)

In response in his own closing, after reminding jurors of testimony indicating that "there were certain behavioral changes ... observed in Frank Chalue just prior to his death" (*id.* at 3272:3–4), the prosecutor stated:

You saw the photographs. This man was stabbed 17 times. Blood was going all over the place. Would it be logical ... that the person who stabbed him could be covered with blood and would it necessary follow ... that that person be wearing any clothing? Now, you've seen the photographs .... [W]hat kind of activity do you think was going on in that bedroom? Ask yourselves that. Don't leave your common sense at home. Does it necessarily follow ... that that person who was with Mr. Chalue had any clothes on at all? Could you infer ... that he ... washed the blood off? Mr. Chalue was naked except for pants below the knees. Do you think you can infer that this person was necessarily clothed that was with him in that bedroom?

(*Id.* at 3293:3–22.)

b. *The Investigation into Potentially Improper Communications with the Jury Foreman.*

According to the *Healy I* court,

During the trial it came to the attention of the prosecutor that the foreman of the jury, Paul L. Briere, might have been subjected to extraneous influences in the form of improper communications by a third person. The third person was a law student, Paul Ramy, who was employed by the same company as Briere....

On April 2, 1981, just before closing arguments, the judge ... examined Ramy under oath, and also questioned

---

**9.** The prosecutor also engaged in the following discussion with Petitioner's aunt:

Q. Mrs. Larivee, is it not a fact that George Roy and Wayne Healy sleep in the same bed and slept in the same bed the whole time you lived there with the exception of some nights when it was hot?
A. That's right.
Q. So during the Fall they would sleep in the same bed?
A. That's right.
Q. In the Winter they would sleep in the same bed?
A. That's right.
Q. During the Spring they would sleep in the same bed?
A. Yes.
Q. And during the Summer, with the exception of a few nights, they would sleep in the same bed?
A. Yes.
(Dkt. No. 43, Trial Tr. 2924:8–22, Apr. 1, 1981.)

the foreman. These sessions were held separately in the judge's lobby in the presence of counsel. Counsel were permitted to question [Ramy] and apparently to suggest questions to the judge to ask the foreman.

Ramy testified that Briere had said that he had been made foreman; that many exhibits had been introduced and it had been a "very long day"; that it was a difficult case; that he hoped the jury would be able to bring a transcript to the jury room with them. When Briere was first empanelled, Ramy told him that he could not look at Ramy's evidence books. Briere never commented to Ramy on the evidence, asked him about the admissibility of evidence, or talked to him about what was going on in the courtroom.

Briere stated that he had asked Ramy whether a jury were allowed to take a transcript of the trial into the jury room and that he had speculated to Ramey as to whether evidence was being questioned. He said, "The questions I asked were general in nature and have nothing to do with the specifics of the case." He denied having discussed the evidence, its admissibility or exclusion, or any other aspect of the case with Ramy. The judge instructed the foreman that he could consider only the evidence he heard in the courtroom and that he had to take the law from the judge. He told him to tell the rest of the jury that he had been in the lobby discussing scheduling with the judge. The judge also told Briere not to entertain a grudge against either side because he had been questioned. Briere resumed his seat on the jury. The record indicates no objection by either counsel.

*Healy I*, 471 N.E.2d at 373–75.

c. *The Balance of the Evidence.*

On Friday, April 3rd, the jury began its deliberations. (Dkt. No. 46, Tr. Trial Pro-

ceedings 3:14–15.) The following morning, the jury foreman sent the trial judge a note on behalf of the jury requesting clarification on the issues of permissible inferences, reasonable doubt, and circumstantial evidence. (Dkt. No. 47, Tr. Trial Proceedings 8:20–9:1.) When the jury had not reached a verdict by nine o'clock on Saturday night, the prosecutor unsuccessfully moved for a mistrial. (*Id.* at 22:9–17.)

On Monday, April 6th, a newspaper article appeared in the *Holyoke Transcript* entitled, "Friends Rally for Healy." (Dkt. No. 49, Tr. Trial Proceedings 14:16–17:19.) This prompted the prosecutor to move again for a mistrial on April 7th. (*Id.* at 4:21–23.) In response to this motion, the trial judge stated:

> this is a very, very, very delicate trial. The Commonwealth's case ... consists of admissions allegedly made by Mr. Healy and inconsistent—in other words, it's entirely, purely circumstantial evidence, so it's right in the balance in the sense of this, when you have a circumstantial case like this, I can't remember one in many years where a case is so delicately balanced than that even in a small matter, if the jury found out about it, it could tip the balance.

(*Id.* at 24:20–25:5.)

After a *voir dire* examination revealed that one of the jurors had seen Petitioner's name in the headline (*id.* at 37:15–17, 47:14–22), the prosecutor urged that the juror be removed, but noted that doing so "would certainly have the potential of affecting the other remaining members of the panel." (*Id.* at 50:6–7.) Asked by the court how one juror's removal might make the others feel, the prosecutor conceded that "there's no way that you can read into

the minds of jurors" (*id.* at 50:17–18), but stressed the closeness of the case: "I think what we're after here is a fair judgment—evidence, anything could tip that balance." (*Id.* at 50:19–21.)

Calling this a "difficult case" (*id.* at 69:2) in a "delicate balance" (*id.* at 69:4), the court ultimately denied the prosecutor's motion for a mistrial and ordered the jurors sequestered, (*id.* at 69:13,16). The following day, the jury found Petitioner guilty of first-degree murder. (Dkt. No. 50, Tr. Jury Verdict 6:16–21).

### 4. *Petitioner's Initial Quest for Post-Conviction Relief.*

On April 10, 1981, one day after Petitioner was sentenced to life in prison, defense counsel learned that Ramy and the jury foreman Briere were not the social friends they had claimed to be during the April 2nd lobby conference, but had, in fact, been living together during the trial. (Dkt. No. 51, Tr. Lobby Conference 3:5–9, 20–23, Apr. 13, 1981). After speaking with Ramy's lawyer in another lobby conference on April 13th, the trial judge reopened his investigation into the Ramy–Briere relationship and ordered both men to appear for a third lobby conference on April 16th. The next day, April 14, 1981, the Petitioner appealed his conviction.

> On April 16th,
> Briere stated, under oath, that because of marital problems he had been renting a room from Ramy during the period of the trial. He testified that he had told Ramy during the trial that he could not discuss the case with anyone. He had asked Ramy if the jury could see a transcript and what a "voir dire" was. Ramy had told him that he knew someone who was a spectator at the trial. Ramy had said that that person was known to him only as "Dick." Sometimes at night he would repeat "Dick's" com-

ments to Briere. Briere "tried very hard to be stoic." At various points Ramy said that he heard that [Petitioner] took the stand that day or that there had not been a trial another day. Defense counsel asked Briere if Briere had had a conversation with Ramy about the credibility of [Petitioner's] testimony, along the line indicated by Ramy's statement to his fellow student. Briere replied, "No, I didn't."

Ramy's testimony on April 16 was consistent with his earlier testimony as to conversations he had had with Briere about the trial. However, it became clear on April 16 that Ramy had been evasive on April 2 about the fact that Briere was living with him. On April 16 Ramy was extremely evasive, to put it charitably, about what he had said and to whom he had said it relative to ... what period Briere was living with him; and whether he had told Briere about what had been said at Ramy's first visit to the judge's lobby. Furthermore, Ramy was unable to give any more information about "Dick" other than that "Dick" was not a lawyer or a law student, that he had met "Dick" sixteen years before in a bowling league, and that he had had the conversation about the trial with him at a supermarket meat counter. He swore "[u]nequivocally," though, that " 'Dick' was not Paul Briere."

The judge had referred to "Dick" as "mysterious" and said that defense counsel probably thought that "Dick" was Briere and would be perfectly right in filing a motion for a new trial. He had advised Ramy to get a lawyer and to return on another day. At the end of the hearing the judge asked Ramy to try to locate "Dick" and to bring him back to the court. The judge said, "[T]he only thing I'm interested in is quite frankly to make sure the verdict was not

tainted by the outside news, or by any members of the jury .... So, bring in this guy 'Dick' ... if there is such a person because I want to make sure the verdict was not tainted in any way, shape or manner." He set a further hearing for April 28 ....

*Healy I,* 471 N.E.2d at 374–75.

On April 23, 1981, the trial judge left the Superior Court and became an Associate Justice of the Massachusetts Appeals Court. The April 28th hearing did not take place.

On July 15, 1981, Petitioner filed a motion for a new trial in the Superior Court, noting that the trial judge's "investigation could not be continued." (Dkt. No. 9, Ex. 2, Def. Mot. New Trial 3.) At the close of oral argument on August 12, 1981, the Superior Court judge who inherited the case denied Petitioner's motion, ruling that there was "no dangling matter" (Dkt. No. 53, Mot. Hr'g New Trial 23:23–24:1) and "no evidence that the jury verdict was tainted," (*id.* at 26:18–19). The judge declined to hear from Briere or Ramy, who had been subpoenaed by Petitioner and were at the courthouse ready to testify. (*Id.* at 8:2–4) On August 28, 1981, Petitioner filed a motion requesting an evidentiary hearing to determine "whether 'Dick' was Briere or someone else" and whether there had been improper contact with a sitting juror. On September 8, 1981, the same judge denied the motion.

The Petitioner appealed both the denial of his motion for a new trial and the denial of his request for an evidentiary hearing to the SJC. In addition, he filed "a second motion for a new trial, together with other motions." *Healy I,* 471 N.E.2d at 363; *see also id.* at 363 n. 1 (noting Petitioner's "motion for permission to interrogate jurors and witnesses"). On November 28, 1984, the SJC denied Petitioner's new motions and affirmed both his conviction and

the denial of his initial motion for a new trial. *Id.* at 363.

In doing so, the SJC determined that the trial judge did not err "in admitting photographs of the victim's body, taken at the scene, which showed his genitals," or "in admitting a photograph which showed the back of the victim's body and his bound hands." *Id.* at 367. The former pictures "had probative value as depictions of the position and condition of the body as the police officers found it," and the latter "was relevant because it showed the victim's bound hands." *Id.* (stating that the trial judge's instructions cured "[a]ny prejudice which otherwise might have resulted from the association of the body's position with homosexual activity"). Whether "the murder was in any way linked to homosexual activity was," the SJC determined, "properly to be decided by the jury." *Id.*

The SJC also held that the state trial judge did not err when he admitted the pair of undershorts containing semen "consistent with the victim's blood group." *Id.* at 368. Despite Petitioner's argument that "the admission of this evidence was prejudicial, because it suggested masturbation and homosexuality," the court concluded that these undershorts, "found about four or five feet from the victim's body[,] ... were especially relevant, since it appears from the record that there was no underwear on the body." *Id.*

In response to Petitioner's claim that testimony concerning the victim's conduct in the week before his death was irrelevant, the *Healy I* court held that "it tended to show that ... the victim had formed a sexual relationship with someone other than his girlfriend." *Id.* Whether this "had anything to do with Chalue's murder" was, the SJC determined, another matter left for the jury. *Id.* ("We cannot say that the testimony did not throw light on Chalue's murder.").

The SJC also found "no basis" for the claim that "during the prosecutor's cross-examination of defense witnesses ... he persistently made flagrantly prejudicial references to [Petitioner]'s homosexuality." *Id.* at 372. In particular, the court addressed the question posed to Petitioner about whether he knew the victim was bisexual. *Id.* While the Commonwealth admitted at oral argument "that there was no evidence at trial that Chalue was bisexual," the court concluded the question was not improper in light of Bendickson's testimony during the *voir dire* hearing

> that the frequency of her sexual relations with Chalue had decreased over the six months prior to the murder and that Chalue had told her that, because at one time in his life he had been raped by his five brothers, he felt that he could not "please a woman."

*Id.* In addition, the SJC found that "[t]here was no impropriety" in repeatedly asking Petitioner, Roy, and Petitioner's aunt about whether Petitioner and Roy shared a bed, since "[t]he purpose of this questioning was to establish bias on the part of ... [Petitioner's] most important witness." *Id.* at 372–73 (noting that Petitioner's aunt "had told the police officers that the two took turns sleeping on the couch").[10]

The court also held that there was nothing improper about the prosecutor's efforts, during closing argument, to convince the jury that neither Petitioner nor Roy hid their sexual preference. *Id.* at 373 (suggesting that the aim of such efforts was to discredit the explanations offered by Petitioner and Roy "as to why they had

agreed to lie about the time [Petitioner] returned home after seeing Chalue"). Likewise, the SJC found the insinuation that Petitioner was naked at the time of the murder a "fair inference[ ] from the evidence." *Id.* (citation omitted). While it would have been improper to have suggested that Petitioner's homosexuality "made him more likely to commit murder," or that his homosexuality in and of itself "was enough to link him to Chalue's murder," *Healy I* found that "[t]he prosecutor suggested neither." *Id.* Instead, he merely "insinuated a sexual or homosexual element to Chalue's murder which was ... fairly inferable from the evidence in the case." *Id.*

Finally, the SJC stated that it saw "nothing in the record of the lobby conferences of April 2 and April 16 to necessitate a further evidentiary hearing." *Id.* at 375. Assuming *arguendo* that the jury foreman "did express to Ramy his views on [Petitioner's] credibility," this would "not constitute an extraneous influence." *Id.* Accordingly, after holding that "the motion judge acted within his discretion," *id.*, the SJC denied Petitioner's "motion for permission to interrogate jurors and witnesses." *Id.* at 375 n. 17.

## B. Healy II.

In 1994, Petitioner filed a motion to obtain the release of certain exhibits in order to conduct DNA testing. The motion was allowed in part, and the exhibits were sent to a laboratory in California chosen by Petitioner. On April 11, 1997, Petitioner filed a third motion for a new trial in the Superior Court[11] along with a

---

**10.** According to the SJC, additional questions were intended to establish "that it was not usual for [Petitioner] or Roy to sleep on the living room couch where he spent at least part of the early morning hours of August 8." *Healy I,* 471 N.E.2d at 373 n. 14.

**11.** This motion "did not rely on (or make reference to) the results of [Petitioner's] expert's forensic testing." *Commonwealth v. Healy,* 438 Mass. 672, 783 N.E.2d 428, 432 n. 5 (2003) ("*Healy II* ").

motion for additional discovery.[12] (Dkt. No. 10, Ex. 10, Def.'s Mot. New Trial 1–2.) In response to that discovery request and subsequent subpoena, Petitioner finally received the three reports prepared by Dr. Wakefield. (Dkt. No. 10, Ex. 17, Super. Ct. Findings, Rulings, & Order 7.)

On July 30, 1999, Petitioner amended his third motion for a new trial, arguing that the Commonwealth's failure to disclose the postmortem report and the note violated his federal constitutional rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Dkt. No. 10, Ex. 13, Def.'s Prelim. Mem. Supp. Am. Mot. New Trial 2.) The state Superior Court judge hearing the motion allowed Petitioner's request for an evidentiary hearing, which was held on October 26, 2000. On May 8, 2001, the court issued its findings of fact, rulings of law, and order denying Petitioner's motion. Among the facts the court found were the following:

> Two members of the state police and two Holyoke police officers attended the autopsy. Police communicated to Dr. Wakefield during the autopsy that they believed that this was a homosexual murder. Consequently, Dr. Wakefield closely examined the victim's external genitalia and rectum for marks, redness, distension, abrasion, dried seminal fluid, or any other signs of sexual activity. At the direction of police present at the autopsy, Dr. Wakefield took swabs of the victim's mouth and anus to test for the presence of spermatozoa. The test results were negative.

(Dkt. No. 10, Ex. 17, Super. Ct. Findings, Rulings, & Order 4.)[13]

On February 13, 2003, the SJC upheld the Superior Court's ruling. *Commonwealth v. Healy,* 438 Mass. 672, 783 N.E.2d 428, 430–31 (2003) (*"Healy II"*). In its opinion, the *Healy II* court provided the following summary of the Superior Court judge's findings:

> In support of the amended motion for a new trial, an affidavit of trial counsel was submitted alleging that in preparation for trial he had received and reviewed the final diagnosis, but that he had not seen the postmortem report or the note and was not aware of the taking of any swabs. Following an evidentiary hearing on the issue of what items had been provided in discovery, the motion judge found that the hospital had forwarded both the postmortem report and the final diagnosis to the district attorney's office. However, the district attorney's office gave [Petitioner's] trial counsel only the final diagnosis, not the postmortem report. The judge concluded that this failure on the part of the prosecutor was the product of inadvertence, not wilful misconduct. With respect to the note, the motion judge was unable to determine whether the hospital or Dr. Wakefield had ever turned the note over to the district attorney's office, and hence did not find any form of prosecutorial misconduct with respect to the

---

**12.** That same day, Petitioner filed a federal *habeas corpus* petition, requesting a stay until such time as he had exhausted his additional claims in state court. This court denied the motion for a stay on November 12, 1997, ruling that Petitioner would have twelve days to file a new petition following final adjudication of his new claims in state court.

**13.** In addition, the Superior Court judge found that Petitioner's trial counsel "specifically requested that [the prosecutor] turn over all witnesses' statements, scientific reports, and exculpatory evidence." (Dkt. No. 10, Ex. 17, Super. Ct. Findings, Rulings, & Order 6.) Had Petitioner's trial counsel "receive[d] the documents referring to tests for sperm," the court found "he would have used them." (*Id.*)

note. Notwithstanding the prosecutor's failure to provide defense counsel with the postmortem report, the motion judge held that [Petitioner] did not meet his burden of showing that the postmortem report was exculpatory or material. He therefore denied the motion for a new trial.

*Id.* at 432–33 (footnote omitted).

In its decision, the SJC accepted the lower court's finding that the postmortem report had not been produced. *Id.* at 433 n. 6 (stressing the need to defer to the judge's "assessment of witness credibility"). It also found that, although

> the note was [not] within the prosecutor's possession or control[,] . . . had the postmortem report been turned over to defense counsel, it would have alerted him to the fact that oral and rectal swabs had been taken for further examination, and competent counsel would presumably have followed up on that information and thereby obtained the test results that are reflected in the note.

*Id.* at 434 n. 8. "Thus," the court continued, "although the Commonwealth's obligation to turn over documents did not extend to the note, the failure to produce the postmortem report effectively deprived [Petitioner] of access to the note." *Id.* Accordingly, the SJC considered whether the postmortem report and/or the note constituted exculpatory and material evidence for the purposes of the alleged *Brady* violation. *Id.* at 434 n. 8, 434.

Ultimately, *Healy II* held that "even if the prosecution had supplied the [postmortem] report to [Petitioner] in timely fashion, the report or available evidence disclosed by it [i.e., the note] would not have influenced the jury." *Id.* at 438 (citation omitted). In reaching this decision, the court reasoned that the suppressed evidence would not have undermined the prosecution's "theory that the murder was connected with some form of sexual encounter." *Id.* at 436. For the *Healy II* court, "[t]he absence of spermatozoa in the victim's rectum or mouth mean[t] only that any sexual activity that occurred had not resulted in ejaculation in or around those specific areas." More significant than the findings of the postmortem report and note were the semen-stained underwear found "[f]our to five feet from the victim's body." *Id.* at 436 n. 10 (citing *Healy I*, 471 N.E.2d at 368) (calling this evidence "especially relevant"). "Similarly," the SJC stated that "the absence of any 'marks' or 'abnormal findings' on the victim's genitals and rectum mean[t] only that any sexual activity that occurred had not been sufficiently forceful or forcible to have inflicted visible injury." *Id.* at 436; *see also id.* at 436 n. 11, (noting that Dr. Wakefield's "examination of the victim's rectum revealed 'no distention . . . no redness or tears,' and that examination of the victim's genitalia uncovered 'no evidence that the penis was abraded or particularly red' "). Furthermore,

> [t]here is a wide range of sexual activity, up to and including many forms of sexual assault, that leaves neither sperm nor signs of injury to sexual organs. The Commonwealth presented no evidence, and did not make any suggestion to the jury, concerning precisely what forms of sexual activity may have taken place, or at what point in that sexual activity the encounter had turned violent, and no such precision with respect to the nature of the posited sexual encounter was even remotely necessary to the Commonwealth's case. Thus, that Dr. Wakefield's examination had arguably eliminated a few specific types of sexual activity did not, in any sense, undermine the evidence suggesting that the stabbing had occurred during the course of

some form of sexual encounter. We agree with the motion judge's conclusion that the postmortem report and note "would not have provided any more material information or raised any more doubts about the sexual nature of the crime."

Moreover, the theory that the murder had occurred during a sexual encounter was of significance to the case in only a narrow, limited sense. The Commonwealth did not even reference this theory in closing argument, except to counter one point raised during defense counsel's closing argument. . . .

[T]he Commonwealth's theory did not rely on evidence of any specific form of sexual activity, nor did the Commonwealth suggest any motive for the stabbing of the victim. The only way in which the sexual nature of the encounter had any significance was to establish the reasonable possibility that the perpetrator may have been naked, so that the jury would not attach undue importance to the fact that [Petitioner's] shirt was bloodstained in only one small area. The absence of sperm in the victim's mouth or rectum, and the absence of signs of physical injury to his genitals or rectum, would not have detracted from the Commonwealth's suggestion that the perpetrator may well have been unclothed at the time of the stabbing.

[Petitioner] correctly points out that there was extensive reference at trial to [Petitioner's] homosexuality. However, that issue was raised by [Petitioner's] own explanation as to why he had initially lied to the police about his whereabouts on the night of the murder and why he had asked his partner to concoct a false alibi. [Petitioner] claimed that he had been reluctant to tell the police his true whereabouts because he had been at two "gay" bars. To illustrate the implausibility of this proffered explanation, the Commonwealth introduced evidence that [Petitioner] was openly homosexual, with no need or desire to conceal his sexual orientation. This evidence concerning [Petitioner's] homosexuality had nothing to do with any theory how or why the murder had been committed, but was directed instead at the interpretation to be placed on what the Commonwealth had proffered as consciousness of guilt evidence.

*Id.* at 436–37.

"Similarly," the court stated, "as part of its impeachment of [Petitioner's] partner (who had given testimony favorable to [Petitioner]), the Commonwealth introduced evidence of their long-standing intimate relationship for the purpose of demonstrating bias." *Id.* at 437 n. 12.

As illustration of the minimal significance that the issue of the hypothesized sexual encounter played at trial, defense counsel's lengthy closing argument nowhere mentioned the fact that the Commonwealth had presented no physical evidence of any such sexual encounter. While [Petitioner] now protests that he would have made great use of the postmortem report and note had he had them at trial, he ignores the fact that, on the evidence presented at trial, he could have but did not register *any* criticism of the lack of evidence on this issue. We agree that, in the absence of the postmortem report and note, defense counsel would reasonably have refrained from cross-examining Dr. Wakefield on the absence of such evidence (for fear of eliciting some unforeseen harmful evidence). However, once the evidence was closed, defense counsel could have vehemently—and safely—argued to the jury that the prosecution had not presented any physical evidence from the victim's body to corroborate that sexual

activity had preceded the murder. The Commonwealth had not presented any evidence of seminal fluid or sperm on the victim, or any evidence of forcible penetration. If, as [Petitioner] now contends, it was crucial to his defense that he cast doubt on the theory that there had been a sexual encounter, it is puzzling that he did nothing whatsoever to cast doubt on that theory with the evidence (or lack thereof) that was presented at trial. We are not confronted with a situation where an argument made at trial could have been made more forcefully if defense counsel had had the withheld evidence. Here, there was no such argument made at trial.

The only difference between the argument that could have been made at trial and the argument that could have been made with the postmortem report and note was that the Commonwealth had looked for certain signs of sexual activity and not found those particular signs. If the absence of that particular evidence related to sexual activity had, in fact, been important to the defense, that absence would surely have been pointed out to the jury. Instead, [Petitioner's] closing argument did not in any way contest the inference that the attack on the victim had occurred during the course of some unidentified form of sexual activity. What [Petitioner] now proffers as the "more plausible theory" to explain the condition of the victim's body—that he was "set upon by looters," "tied up simply to incapacitate and silence him," and that "he managed to wriggle free of his boots (possibly dislodging his pants) and was stabbed to prevent his getting away"—is a theory that could have been, but was not, presented to the jury.

*Id.* at 437–38 (citation omitted).

In a footnote, the *Healy II* court stated that this theory

was presumably not presented for the simple reason that the theory did not comport with other evidence. Aside from the implausibility of the notion that "wriggling free" of his boots would cause the victim's pants to fall to his knees, the suggestion that the crime was perpetrated by "looters" was contradicted by the evidence of no forced entry, no sign of any rummaging through the victim's belongings, and no missing property. It is also difficult to understand why "looters" would bypass numerous empty apartments and seek to loot the one apartment that was occupied by a man and his Doberman pinscher. The contents of the postmortem report would not have helped [Petitioner] overcome the numerous shortcomings of the now proffered theory that "looters" stabbed the victim.

*Id.* at 438 n. 13.

Finally, the SJC rejected Petitioner's "contention that the postmortem report and note would have helped him establish that the police investigation was biased." *Id.* at 438 ("From the condition of the victim at the crime scene—semi-naked, bound, pants pulled down, and genitals exposed—it would be reasonable for the police to consider and investigate the possibility that the murder had some connection to sexual activity.").

## C. *Magistrate Judge Neiman's Report and Recommendation.*

On February 14, 2003, one day after the SJC's decision, Petitioner filed this *habeas corpus* petition, and on July 1, 2003, Respondent tendered an answer. On December 1, 2003, Petitioner filed a memorandum in support of his petition as well as a motion for an evidentiary hearing on the issue of juror taint. In due course, Respondent filed memoranda opposing both

the petition and the request, and Petitioner filed replies. In the meantime, this court referred the matter to Magistrate Judge Neiman. On September 9, 2004, he issued his report and recommendation.

### 1. *Petitioner's* Brady *Claim.*

In contrast to the *Healy II* court, Magistrate Judge Neiman concluded that the suppressed, exculpatory evidence would have raised doubts about the sexual nature of the crime and detracted from the prosecution's theory of how and why the murder had been committed. In short, the Magistrate Judge found *Healy II* "[un]reasonably concluded that the postmortem report and note concerned an issue of 'minimal significance'" and "unreasonably disregarded the trial judge's observation that the case was so close that even a 'small matter' could have changed the outcome." (Dkt. No. 64, Report & Recommendation 26–27.)

### 2. *Petitioner's Request for an Evidentiary Hearing.*

In addition, Magistrate Judge Neiman determined that the AEDPA did not bar Petitioner's request for an evidentiary hearing since he had been diligent in developing his jury taint claim in state court, and that Petitioner was entitled to such a hearing under the standard set forth in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *as modified by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

### 3. *Petitioner's Insufficiency of Evidence Claim.*

Finally, Magistrate Judge Neiman concluded that while "there was sufficient circumstantial evidence to convict Petitioner of murder based on the record before the jury" (Dkt. No. 64, Report & Recommendation 39), he recommended that, in light of his other recommendations, this portion of the petition be denied without prejudice.

## III. DISCUSSION

### A. *Petitioner's* Brady *Claim.*

#### 1. *Standard of Review.*

▪ To establish a constitutional violation predicated upon the prosecution's alleged failure to provide exculpatory evidence, Petitioner must prove that evidence favorable to him was suppressed by the state and that he was prejudiced by the suppression. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Where, as here, "the state court applied the proper rule of law by asking if the [petitioner] was prejudiced," *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir.2002) (en banc) (citing *Strickler,* 527 U.S. at 281–82, 119 S.Ct. 1936), a federal *habeas* court may not grant relief unless the state court's adjudication "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States," *Norton v. Spencer,* 351 F.3d 1, 6 (1st Cir. 2003) (citing 28 U.S.C. 2254(d)(1)) (2005), *cert. denied,* 542 U.S. 933, 124 S.Ct. 2876, 159 L.Ed.2d 798 (2004).[14] While the Supreme Court has acknowledged the difficulty of defining the term, "unreasonable,"

---

**14.** After seeking relief exclusively under subsection 2254(d)(1), Petitioner filed a supplemental memorandum of law arguing "in the alternative, [that] the SJC's adjudication of [his] *Brady* claim requires relief under section 2254(d)(2)." (Dkt. No. 61, Suppl. Mem. Supp. Writ Pet. 7.) Under subsection (d)(2), a *habeas* court may grant relief only if the adjudication in question involved "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Because the court will grant relief under subsection 2254(d)(1), it is not necessary to address this argument.

it has clarified that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Terry Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Accordingly, a federal court faced with an "unreasonable application" inquiry [15] must ask whether the state court's decision was "objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495.

■ In this circuit, "[t]he fact that one court or even a few courts have applied the precedent in the same manner to close facts does not make the state court decision 'reasonable.'" *McCambridge*, 303 F.3d at 36 (quoting *Valdez v. Ward*, 219 F.3d 1222, 1229–30 (10th. Cir.2000), *cert. denied*, 532 U.S. 979, 121 S.Ct. 1618, 149 L.Ed.2d 481 (2001)). *See also Norton*, 351 F.3d at 8 ("A state court decision may be 'unreasonable' if it is devoid of record support for its conclusions or is arbitrary."). On the other hand, "if it is a close question whether the state decision is in error, then the state decision cannot be . . . unreasonable." *McCambridge*, 303 F.3d at 36 (citing *Francis S. v. Stone*, 221 F.3d 100, 111 (2nd Cir.2000)) ("[S]ome increment of incorrectness beyond error is required."). "Importantly, the test does not demand infallibility: a state court's decision may be objectively reasonable even if the federal habeas court, exercising its independent judgment, would have reached a different

conclusion." *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir.2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003) (citations omitted). Cognizant of such strictures, this court now turns to the specifics of Petitioner's *Brady*-based due process claim.

2. *Analysis.*

■ Because the state pathologist's inability to locate evidence of sexual activity clearly favored Petitioner,[16] and *Healy II* held that such evidence was suppressed,[17] the sole issue before the court is whether this suppression was prejudicial. To satisfy *Brady*'s prejudice prong, Petitioner must demonstrate that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. 1936 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). "[T]here is no prejudice under *Brady* . . . unless there is 'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *McCambridge*, 303 F.3d at 37 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)) (describing this as "the *Brady* prejudice or materiality standard").

---

**15.** Petitioner does not contend that SJC's decision was "contrary to" clearly established federal law. (*See* Dkt. No. 18, Pet'r's Mem. Supp. Writ Pet. 19.)

**16.** The Commonwealth acknowledges that "the government both possessed and suppressed the evidence" and that "the evidence was favorable to [Petitioner] because it was 'exculpatory, or . . . impeaching.'" (Dkt. No. 70, Resp't's Objections 11 n. 10 ("Only the SJC's resolution of the third [*Brady*] prong," whether Petitioner was prejudiced by suppression of favorable evidence, "is addressed

here."); *see also* Dkt. No. 57, Resp't's Opp'n Writ Pet. 15 (discussing only "the 'prejudice' prong").)

**17.** "The Government's good faith (or lack thereof) in failing to disclose favorable evidence is irrelevant." *Conley v. United States*, 415 F.3d 183, 185 n. 1 (1st. Cir.2005) (citing *Brady*, 373 U.S. at 87, 83 S.Ct. 1194). "For ease of exposition," this court, like the First Circuit and the Supreme Court, "refer[s] to the Government's nondisclosure of favorable evidence as the 'suppression' of evidence." *Id.*

This "reasonable probability" requirement does not mean that Petitioner must prove that the disclosure of the postmortem report and/or the note would have led to a different verdict, but rather that the suppression of this material resulted in an outcome unworthy of confidence. *United States v. Schneiderhan*, 404 F.3d 73, 79 (1st Cir.2005) (citing *Strickler*, 527 U.S. at 289–90, 119 S.Ct. 1936; *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555), *cert. denied*, —— U.S. ——, ·126 S.Ct. 381, 163 L.Ed.2d 167 (2005). As the First Circuit has noted, the "somewhat delphic 'undermine confidence' formula" articulated in *Strickler* "suggests that reversal might be warranted in some cases even if there is less than an even chance that the evidence would produce an acquittal." *Conley v. United States*, 415 F.3d 183, 185 (1st Cir.2005) (quoting *United States v. Sepulveda*, 15 F.3d 1216, 1220 (1st Cir.1993), *cert. denied*, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994)); *see also United States v. Cunan*, 152 F.3d 29, 34 (1st Cir.1998) (stating that a petitioner may be entitled to a new trial under *Brady* without convincing "the court of the certainty of a different outcome").

Here, the prosecution's failure to turn over the evidence in question "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375. Any conclusion to the contrary would simply ignore how extremely close a case this was and fail to recognize the prominent role evidence and argument regarding homosexuality had in the trial.[18]

In *Healy II*, the court weighed the factual import of the withheld forensic evidence without ever placing it in the context of a "delicately balanced" case. (Dkt. No. 49, Tr. Trial Proceedings 25:3–4.) This was objectively unreasonable. *See Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir.2005) ("In a close case, the failure of defense counsel to present certain evidence or effectively challenge the state's evidence on important issues can be particularly prejudicial."). A review of the record reveals that the trial judge himself repeatedly stressed the delicate nature of this circumstantial case (*see, e.g., id.* at 68:22–69:4) and offered his opinion that even the slightest change in what came before the jury could have major ramifications, (*id.* at 25:4–5 ("[E]ven ... a small matter, if the jury found out about it, ... could tip the balance.")).

Respondent contends that the SJC was not "required to expressly discuss [the trial judge's] comments." (Dkt. No. 70, Resp't's Objections Report & Recommendation 17.) While this may be so, the court was required to ground its discussion in "the facts and circumstances of the case." *Bui v. DiPaolo*, 170 F.3d 232, 243 (1st Cir.1999) (citation omitted), *cert. denied*, 529 U.S. 1086, 120 S.Ct. 1717, 146 L.Ed.2d 640 (2000).

The record is replete with references to serious problems in the Commonwealth's case. *See Healy II*, 783 N.E.2d at 431 ("Evidence that [Petitioner] committed the crime was entirely circumstantial."). (*See also* Dkt. No. 10, Ex. 17, Super. Ct. Find-

---

**18.** Like the Magistrate Judge, this court rejects Petitioner's argument that the suppressed evidence would have aided his theory of police bias. (Dkt. No. 18, Pet'r's Mem. Supp. Writ Pet. 30–31.) Although Dr. Wakefield testified that the police informed him before the autopsy that "this was a homosexual-related murder" (Dkt. No. 54, Mot. Hr'g New Trial 10:7–9, Oct. 26, 2000), the SJC's refusal to characterize this as evidence of a "rush to judgment" was not objectively unreasonable. Indeed, as Petitioner himself points out, the "crime scene reeked of brutality and loss of control." (Dkt. No. 61, Suppl. Mem. Supp. Writ Pet. 9.) Hence, it was not illogical for the police to seek evidence of "any brutal or out-of-control sex involving the victim's genitals, anus or mouth." (*Id.*)

ings, Rulings, & Order 7 ("The Commonwealth had no percipient witnesses and no evidence of a motive.").) The defendant had no criminal record, history of violence, or known antipathy towards the victim. Juror concerns about the evidence were reflected in their requests for further instructions on permissible inferences, reasonable doubt, and circumstantial evidence; their deliberations spanned four days, lasted nearly thirty hours,[19] and ultimately required a sequestration order.[20]

None of this is mentioned in *Healy II*. Also missing from the opinion is any mention of the prosecutor's two motions for a mistrial, or his concession that the case was so close "evidence, anything could tip th[e] balance." In short, at no point did *Healy II* confront the fact that this was "a borderline case," where "even a relatively small error" would have been "likely to tilt the decisional scales." *Ouber v. Guarino*, 293 F.3d 19, 33 (1st Cir.2002) (citation omitted).

Respondent strenuously objects to the consideration of evidence not found in, or contradicted by, the state court's findings. In support of this position, the Commonwealth cites a litany of cases holding that state court factual findings are presumptively correct and that this presumption extends to factual determinations made by appellate courts, as well as factual findings implicit in state court rulings, including: *Parke v. Raley*, 506 U.S. 20, 35, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir.2002), *cert. denied*, 537 U.S. 1236, 123 S.Ct. 1360, 155 L.Ed.2d 202 (2003); *Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir.2002); *Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir.2001); *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir.2000); and *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass.1999). Notably, none of these cases involved allegations of a *Brady* violation. *See Parke*, 506 U.S. at 22–23, 113 S.Ct. 517 (challenge to "burden-shifting" feature of Kentucky's "persistent felony offender sentencing statute"); *Rashad*, 300 F.3d at 30 (right to a speedy trial claim); *Gunter*, 291 F.3d at 78 (ineffective assistance of counsel claim); *Sanna*, 265 F.3d at 7 (alleging unconstitutional warrant-less arrest, transgression of Miranda rights, and improper jury instructions); *Coombs*, 202 F.3d at 17 (involun-

---

**19.** In *Ouber v. Guarino*, 293 F.3d 19, 35 (1st Cir.2002), the First Circuit found that a conviction following "prolonged deliberations ... underscore[d] the closeness of the case (and, therefore, the gravity of *any* error)." More recently, *Dugas v. Coplan*, 428 F.3d 317, 335 (1st Cir.2005), stated that "[t]he length of jury deliberations can be one factor in determining how close the jury viewed the case to be."

**20.** This order, and the *voir dire* examination of the jurors that preceded it, is particularly significant in light of Respondent's contention that AEDPA's presumption of correctness applies only to "basic, primary, or historical facts" and "does not extend to a judge's personal observations about the trial." (Dkt. No. 57, Resp't's Opp'n Writ Pet. 20 (citing *Weaver v. Thompson*, 197 F.3d 359, 363 (9th Cir. 1999)).) In *Weaver*, the trial judge disclosed certain irregularities that occurred during jury deliberations in a letter to counsel, but neither conducted an evidentiary hearing nor granted the petitioner's motion for a new trial. *Weaver*, 197 F.3d at 361, 362. Because the letter, "in addition to being hearsay, [was] not subject to any of the usual judicial procedures designed to ensure accuracy," the Ninth Circuit concluded that it was "not a 'factual determination' within the meaning of § 2254(e)(1), and thus ... not entitled to deference." *Id.* at 363. In contrast, the state trial judge in this petitioner's case did much more than offer a personal assessment. He determined that the case was close enough that a newspaper article casting Petitioner in a favorable light required a *voir dire* of the jurors and sequestration in accordance with *Commonwealth v. Jackson*, 376 Mass. 790, 383 N.E.2d 835, 841 (1978), and *Commonwealth v. Reinstein*, 381 Mass. 555, 409 N.E.2d 1307, 1310–11 (1980).

tary confession claim); *Flores*, 53 F.Supp.2d at 512 (involuntary plea claim).

In *Trigones v. Bissonnette*, 296 F.3d 1 (1st Cir.2002), the Commonwealth made a similar effort to "characterize portions of the SJC's determination as determinations of fact entitled to a presumption of correctness rebuttable only by clear and convincing evidence." *Id.* at 6 n. 4. The First Circuit disagreed, holding that " § 2254(d)(2)'s heightened standard applies only to determinations of basic, primary, or historical facts[;] . . . [i]nferences, characterizations of the facts, and mixed fact/law conclusions are more appropriately analyzed under § 2254(d)(1)." *Id.* (citations omitted). Here, because "[t]he materiality question under *Brady* . . . is a mixed question of law and fact," *Conley*, 415 F.3d at 188 n. 3, the usual presumption of correctness affords Respondent less protection. *See also supra* note 3.

Respondent emphasizes the SJC's determination that the prosecution "did not make any suggestion to the jury . . . concerning precisely what forms of sexual activity may have taken place." (Dkt. No. 70, Resp't's Objections 13 (citing *Healy II*, 783 N.E.2d at 436).) While it is true that the prosecutor refrained from suggesting

any particular expression of sexual conduct, he did show jurors pictures of the victim and urged them to imagine "what kind of activity [they thought] was going on in that bedroom." (Dkt. No. 44, Trial Tr. 3293:11–12.) The precise effect of this invitation to speculate is, of course, impossible to know. However, the fact that jurors were left to mull the question without the benefit of Dr. Wakefield's expert observations undermines confidence in their deliberations,[21] particularly in view of the SJC's conclusion that the semen-stained underwear found on the victim's dresser was "especially relevant." *Healy II*, 783 N.E.2d at 436 n. 10 (citing *Healy I*, 471 N.E.2d at 367–68).

In examining the record and the arguments, this court has borne in mind that "state courts are not required to supply the specific reasons that a federal court thinks are most persuasive for upholding the judgment." *Bui*, 170 F.3d at 243. Every decision a court makes must reach its last page eventually; many issues or pieces of evidence must necessarily be addressed cursorily or not at all. This case, however, presents the unusual situation where the central issue presented by Petitioner—whether the murder occurred dur-

---

**21.** Under Massachusetts law, "the judge's task is to decide what effect the [prosecutor's failure to disclose exculpatory evidence] might have had *on the jury*." *Commonwealth v. Tucceri*, 412 Mass. 401, 589 N.E.2d 1216, 1222 (1992) (emphasis added) ("The issue, we think, is not what, if any, impact the late disclosed evidence has on the judge's personal assessment of the trial record."). *Tucceri* deemed this a departure from the "Federal approach[, which] seems to treat the involvement of a jury in the trial as irrelevant." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)). However, the federal case cited, *Agurs*, was modified by *Bagley*, which adopted the test for materiality found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Bagley*, 473 U.S. at 682, 105

S.Ct. 3375. In *Strickland*, the court held that "the question is whether there is a reasonable probability that, absent the errors, *the factfinder* would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052 (emphasis added). Subsequent Supreme Court and First Circuit cases strongly suggest that the distinction *Tucceri* noted between Massachusetts and federal law no longer exists. *See Strickler*, 527 U.S. at 292, 119 S.Ct. 1936 (noting that even if a witness' testimony "had been entirely discredited, *the jury* might still have concluded that petitioner was the leader of the criminal enterprise") (emphasis added); *Ouber*, 293 F.3d at 34–35 (determining impact on jury of trial counsel's failure to fulfill promise to call witness).

ing the course of a homosexual encounter—was recognized as very significant by the SJC itself. In *Healy I*, the SJC noted that the state of the victim's body made the link between the murder and homosexual activity a proper and relevant question for the jury. *Healy I*, 471 N.E.2d at 367. It further held that the prosecutor's insinuation during closing argument of a "homosexual element to the murder," was a "fair inference[ ] from the evidence." *Id.* (citation omitted). In *Healy II*, the SJC recognized that the "hypothesized sexual encounter" may have helped to "establish the reasonable possibility that the perpetrator may have been naked." *Healy II*, 783 N.E.2d at 437. On this critical issue, the objective, documentary evidence that the Commonwealth wrongfully suppressed tended to show that the victim did *not* die during a sexual encounter.

That the two suppressed documents were not absolutely conclusive on the issue has diminished significance in this case, for two reasons. First, to show a *Brady* violation entitling a *habeas* petitioner to a remedy, the petitioner is not required to demonstrate conclusiveness. *See Schneiderhan*, 404 F.3d at 79 (citing *Strickler*, 527 U.S. at 289–90, 119 S.Ct. 1936; *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). Second, *none* of the evidence in the case, certainly not the prosecutor's, was conclusive; all of it was circumstantial. This court now has the obligation to ask whether the Commonwealth's suppression of clearly relevant evidence on a very significant matter deprives it of confidence in the jury verdict, in the context of an extremely close case. It is not unfair or improper for this court to observe that the SJC's opinion in *Healy II* provides no help, indeed not so much as a comment, on this crucial point. *See Hurtado v. Tucker*, 245 F.3d 7, 17 (1st Cir.2001), *cert. denied*, 534 U.S. 925, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001) (noting that the *Terry Williams* Court found the

Virginia Supreme Court's decision objectively unreasonable based upon its "failure even to mention the defendant's sole argument in mitigation").

In sum, "[t]his case lay on a knife edge, and it would not have taken much to sway at least some jurors towards acquittal." *Dugas*, 428 F.3d 317, 335. Reluctantly, given the closeness of the case and the state of the record viewed as a whole, this court has no choice but to conclude that the Commonwealth's undisputed *Brady* violation did prejudice Petitioner, and the SJC conclusion to the contrary was objectively unreasonable. For this reason, Petitioner is entitled to *habeas* relief.

**B.** *Petitioner's Request for an Evidentiary Hearing.*

1. *Standard of Review.*

Under 28 U.S.C. § 2254(e)(2) (2005), a petitioner who fails to make "a reasonable attempt, in light of the information available at the time, to investigate and pursue his [constitutional] claims in state court" cannot obtain a federal evidentiary hearing, "absent narrow circumstances not applicable here." *Michael Williams v. Taylor*, 529 U.S. 420, 429, 435, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). In order to safeguard state courts' "rightful opportunity to adjudicate federal rights," *Michael Williams* held that "the prisoner must be diligent in developing the factual record and presenting, if possible, all claims of constitutional error." *Id.* at 437, 120 S.Ct. 1479. Ordinarily, diligence dictates "that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.*

Assuming subsection 2254(e)(2) does not preclude an evidentiary hearing, the question becomes whether a petitioner is entitled to one under the standard set forth in

*Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *as modified by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).[22] Under *Townsend,* a *habeas* court "must first determine whether petitioner's allegations, if proved, would establish the right to his relief." *Townsend,* 372 U.S. at 307, 83 S.Ct. 745. If they would, then the federal evidentiary hearing becomes the proper arena to resolve contested factual issues, except in cases where a "full and fair" hearing already enabled "the state-court trier of fact" to "reliably [find] the relevant facts." *Id.* at 312–13, 83 S.Ct. 745 (citation omitted).

█ Wary of articulating "too general [a] standard," the Townsend Court clarified that a federal habeas court "must grant an evidentiary hearing" if:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the

habeas applicant a full and fair fact hearing.

*Id.* at 313, 83 S.Ct. 745.

2. *Analysis.*

█ Petitioner alleges that "third party communications with the jury foreman violated his rights to trial by an impartial jury and to be confronted with the witnesses against him." (Dkt. No. 19, Pet'r's Mot. Evidentiary Hr'g 1.) While proof of these alleged Sixth Amendment violations would establish Petitioner's right to relief, Respondent maintains that giving Healy the opportunity to prove them at a federal evidentiary hearing would be improper due to his failure to act with the requisite diligence in state court.

The cases the Commonwealth cites in support of this position are inapposite, making this threshold argument unpersuasive. For example, in *Alley v. Bell,* 307 F.3d 380, 389–90 (6th Cir.2002), *cert. denied,* 540 U.S. 839, 124 S.Ct. 99, 157 L.Ed.2d 72 (2003), the court held that because a petitioner had received an evidentiary hearing on the issue of judicial bias in state court, it was incumbent upon him to have used that forum to flesh out any and all judicial bias allegations.

In contrast, this petitioner never had access to such a state forum.[23] Despite the Commonwealth's contention that Healy received three evidentiary hearings in

---

**22.** In *Keeney,* the issue was whether *Townsend* required federal evidentiary hearings for petitioners who had not "deliberately bypassed the orderly procedure of the state courts." *Keeney,* 504 U.S. at 4, 112 S.Ct. 1715. The Court held that this "deliberate bypass standard" was inappropriate and adopted a rule requiring federal *habeas* petitioners to "show cause for," and "actual prejudice" from, the inadequate development of material facts at the state court proceedings. *Id.* at 5, 8, 112 S.Ct. 1715. This change in the interpretation of *Townsend* is of minor significance in light of the previously discussed re-

quirements of 28 U.S.C. § 2254(e)(2). *See Michael Williams,* 529 U.S. at 434, 120 S.Ct. 1479 ("[P]risoners who would have had to satisfy *Keeney*'s test for excusing the deficiency in the state-court record prior to AEDPA are now controlled by § 2254(e)(2).").

**23.** Petitioner did, of course, receive a state evidentiary hearing in order to determine the significance of the postmortem report and note. (*See generally* Dkt. No. 54, Mot. Hr'g New Trial, Oct. 26, 2000; Dkt. No. 10, Ex. 17, Super. Ct. Findings, Rulings, & Order.)

state court, the trio of April 1981 lobby conferences were conducted by the trial judge and did not permit Petitioner to offer documentary evidence or to question the jury foreman directly.[24] Moreover, unlike the state evidentiary hearing Petitioner did receive on his *Brady* claim in 2000, these lobby conferences did not produce detailed findings from the trier of fact. (Dkt. No. 9, Ex. 7, Pl.'s Br. Direct Appeal 52 ("If the trial court had made findings after the post-trial hearing that there was no extraneous influence on the juror, that probably would have been the end of the matter.").)

Assuming *arguendo* that the April 1981 lobby conferences were evidentiary hearings, they were certainly not the "full" variety mandated by the *Townsend* Court. Indeed, at the April 16th lobby conference, the state trial judge became so dissatisfied with Ramy's inconsistent answers that he scheduled an additional lobby conference to continue his independent investigation. The determination, by the Superior Court judge who inherited the case, that "there were no matters left undone by the Trial Judge" is simply not supported by the record as established by the trial judge himself.

The Commonwealth's invocation of *Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000), *cert. denied*, 532 U.S. 915, 121 S.Ct. 1250, 149 L.Ed.2d 156 (2001), is equally unavailing. To be sure, the Fifth Circuit did hold that "[m]ere requests for evidentiary hearings will not suffice." *Id.* at 758. However, in contrast to the petitioner in *Dowthitt*, who could have presented affidavits of family members willing to provide

them, *id.*, this petitioner assiduously sought to develop the factual record. As the Magistrate Judge pointed out:

> [Petitioner] promptly filed a motion for a new trial ... and sought an evidentiary hearing with respect thereto. When that request was denied, he filed a timely written objection. When the judge overruled that objection, Petitioner filed a pleading seeking findings of fact. None were made. He then filed a motion for a new trial in the SJC, but that motion was denied as well.

(Dkt. No. 64, Report & Recommendation 36.)

 To suggest, as Respondent does, that Healy "did not independently investigate the facts necessary to support a juror bias claim" is to overlook the constraints under which he operated. Proscribed by a state rule of professional conduct from "initiat[ing] any communication with a member of the jury without leave of court," S.J.C. Rule 3:07, 3.5(d), Petitioner filed a "motion for permission to interrogate jurors and witnesses," *Healy I*, 471 N.E.2d at 363 n. 1. When the *Healy I* court denied the motion, *id.* at 375 n. 17, the SJC effectively barred Healy from conducting an independent investigation. Ultimately, because he is not "at fault for the deficiency in the state-court record," *Michael Williams*, 529 U.S. at 433, 120 S.Ct. 1479, Section 2254(e)(2) does not apply, and the issue now becomes whether Petitioner's case fits within a category articulated by *Townsend*. Because the *Townsend* list is written in the disjunctive, a federal court must grant an evidentiary

---

24. At the time of Healy's trial, Mass. R.Crim. P. 30(c)(3) provided that an evidentiary hearing was only necessary if a defendant's motion for a new trial raised a "substantial issue." *Commonwealth v. Stewart*, 383 Mass. 253, 418 N.E.2d 1219, 1222 (1981). The fact that none of the lobby conferences came as a result of a motion for a new trial is further evidence that they were not evidentiary hearings. (*See* Dkt. No. 53, Mot. Hr'g New Trial 8:5–8, Aug. 12, 1981 ("[N]ot only at the first lobby conference but at the subsequent lobby conference on the 16th ... [Petitioner] had no motion before the court ....").)

hearing under any one of the six stated circumstances set forth above.

The Commonwealth contends that by finding "the facts relevant to Healy's claim" *Healy I* made the requirements of *Townsend* moot. (Dkt. No. 70, Resp't's Objections 25 (citing *Healy I*, 471 N.E.2d at 373–75) ("The SJC ... made very specific findings as to what took place at each hearing, including who testified, the substance of the testimony, the credibility of the witnesses, and the extent to which counsel participated in the hearings.").) However, because these were appellate determinations, and not findings by the state court trier of fact, they do not obviate the need for an evidentiary hearing. *See Townsend*, 372 U.S. at 312–13, 83 S.Ct. 745 (requiring a federal hearing "unless the state-court *trier of fact* has after a full hearing reliably found the relevant facts") (emphasis added). The unavoidable reality is that Petitioner never received an opportunity to probe and develop relevant facts on this issue.

Nor is this a case where this court can infer findings of fact either "because [the trial court's] view of the facts is plain from his opinion or because of other indicia." *Id.* at 314, 83 S.Ct. 745. As previously mentioned, the state trial court judge, who began an independent investigation into third party communications with the juror foreman, suspended his inquiry and at no time "impliedly found material facts," *id.*, or decided the merits of a claim. *Compare Fryar v. Bissonnette*, 113 F.Supp.2d 175, 179–80 (D.Mass.2000). Indeed, he himself strongly implied that a further inquiry *was* necessary.[25] In short, this is a case where "the material facts were not adequately developed at the state-court hearing." *Townsend*, 372 U.S. at 313, 83 S.Ct. 745.

Finally, Respondent argues that Petitioner "has no evidence to proffer. He simply wants to use the evidentiary hearing as a fact-finding exercise." (Dkt. No. 70, Resp't's Objections 26.) Characterizing this as an inappropriate use of this court, the Commonwealth contends that a petitioner who alleges no specific facts that he would produce at an evidentiary hearing is not entitled to one. *Id.* (citing *David v. United States*, 134 F.3d 470, 478 (1st Cir.1998)) ("[A] habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings.").

Rather than forecast the outcome of an evidentiary hearing, Petitioner has focused on the issues that remained unexplored at the end of the April 16, 1981 lobby conference—issues the trial judge himself indicated had to be resolved at a future date in order to ensure "the verdict was not tainted." Accordingly, Petitioner's constitutional claims are not "palpably incredibly," *David*, 134 F.3d at 478 (citing *Machibroda*

---

25. Respondent now contends that the transcript of the August 12, 1981 motion hearing indicates that the Superior Court judge who inherited case refused to grant an evidentiary hearing based, at least partly, on statements made by the trial judge during an off-the-record conversation between the two. (Resp't's Opp'n Pet'r's Mot. Evidentiary Hr'g 4–5.) Notably, the Commonwealth did not take this position in opposing Petitioner's direct appeal. On the contrary, it conceded that the issue of extraneous influence upon the juror had not been resolved. (Dkt. No. 9, Ex. 7, Pl.'s Br. Direct Appeal 51 ("[T]he deter-mination of this issue lacks a coda.").) The relevant transcript, it must be said, is far from clear. (*See* Dkt. No. 53, Mot. Hr'g New Trial 23:10–24:9, 25:19–22.) Assuming *arguendo* that the judge who inherited the case did make such an "inquiry" and had some kind of casual conversation with the trial judge, this court would still be compelled to allow Petitioner an evidentiary hearing. *See Townsend*, 372 U.S. at 313, 83 S.Ct. 745 (requiring an evidentiary hearing when "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing").

v. *United States*, 368 U.S. 487, 495, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962)), and, under the circumstances, he deserves the chance to "develop[ ] them in federal court." *Michael Williams*, 529 U.S. at 443, 120 S.Ct. 1479. The court will give Petitioner that opportunity.

### C. *Petitioner's Insufficiency of Evidence Claim.*

#### 1. *Standard of Review.*

In *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Court held that *habeas* relief for a petitioner alleging insufficient evidence to support his conviction is unwarranted unless "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." In this instance, Healy faces the familiar "double hurdle" of showing that his jury acted irrationally and that the SJC's determination to the contrary was objectively unreasonable. *See McCambridge*, 303 F.3d at 43; *see also Hurtado*, 245 F.3d at 18 (providing five guidelines for "an insufficiency-of-the-evidence case to be used in making the evaluation of 'objective unreasonableness' under § 2254(d)(1)").

#### 2. *Analysis.*

In *Healy I*, the court held that this was "not a case where, on all the evidence, the question of [Petitioner's] guilt was left to conjecture or surmise." *Healy I*, 471 N.E.2d at 371 (citation omitted). Based upon Petitioner's inconsistent statements to the police and the blood evidence, the SJC determined that the trial judge did not err in denying Petitioner's motion, "made at the close of the Commonwealth's case, for a required finding of not guilty." *Id.* at 370–71.

Having reviewed "the totality of the evidence," *Hurtado*, 245 F.3d at 18, this court must conclude that a rational trier of fact could have found guilt beyond a reasonable doubt. Indeed, "an extraordinarily close case" (Dkt. No. 10, Ex. 18, Mem. Supp. Def.'s Appeal Pet. 2), by definition, is one where the evidence could reasonably support more than one outcome. Moreover, because sufficiency-of-the-evidence review restricts itself to evidence adduced at trial, *United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), this court agrees with the Commonwealth that neither of its previous rulings for Petitioner has any bearing on this independent claim. Consequently, the court will deny this claim for *habeas* relief with prejudice.

### IV. *CONCLUSION*

Based on the foregoing, the Report and Recommendation, after *de novo* review, is hereby adopted, in part. The petition for relief pursuant to § 2254 (Docket No. 1) is ALLOWED, in part, and the motion for an evidentiary hearing (Docket No. 19) is hereby ALLOWED. The clerk is ordered to set this case for a status conference to determine the timing, nature, and length of the evidentiary hearing. The court will withhold ordering entry of final judgment pending completion of this hearing.

*REPORT AND RECOMMENDATION REGARDING PETITIONER'S MOTION FOR AN EVIDENTIARY HEARING and PETITION FOR WRIT OF HABEAS CORPUS (Document Nos. 1 and 19)*

NEIMAN, United States Magistrate Judge.

In this action, Wayne Blyth Healy ("Petitioner"), a state inmate serving a life sentence for murder, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Petitioner asserts that his convic-

tion by a Massachusetts jury on April 8, 1981, was obtained because the state failed to disclose material, exculpatory evidence requested by him (Ground One), because of insufficient evidence of guilt (Ground Three), and by improper influence on the jury foreman (Ground Four).[26]

Currently at issue is Petitioner's motion for an evidentiary hearing with respect to the juror taint issue, as well as the petition itself insofar as it addresses the merits of the two other grounds. Both matters have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons indicated below, the court will recommend that Petitioner's motion for an evidentiary hearing be allowed (and that the merits of Ground Four be decided thereafter), that habeas corpus relief be granted with respect to Ground One, and that relief be denied, without prejudice, with respect to Ground Three.

## I. BACKGROUND

There is no dispute that the following facts—found by the Massachusetts Supreme Judicial Court ("SJC") in an opinion addressing Petitioner's direct appeal, *Commonwealth v. Healy*, 393 Mass. 367, 471 N.E.2d 359 (1984) (hereinafter *"Healy I"*)—are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1).[27]

Between 1 and 1:30 A.M. on August 8, 1980, the victim, Richard Frank Chalue,

was heard screaming for help from inside his apartment in Holyoke. Chalue's body was found on his bed shortly before 2 A.M. He had been stabbed fourteen times in the chest, once on either side of the neck, and once on his right thigh. There was also a laceration on his left index finger. His hands had been bound behind him with socks tied together, and he had a gag of socks tied around his mouth. He was naked except for a towel wrapped around his neck and a pair of dungarees half-way down his legs. A pair of boots tied together with socks lay on the floor at the foot of the bed. On the table in the kitchen were a partially empty bottle of rum, two bottles of cola, one of which was partially empty, a glass, and an ashtray containing cigarette butts. The apartment was dark, since there was no electricity as a result of a fire in the building the week before. The victim's Doberman pinscher dog was locked in another room of the apartment. Both the front and the back doors were locked, the front door having been locked with a key from the outside.

Since the fire, the victim had been staying alone in the apartment, with the dog guarding his possessions. His girl friend and her two children, with whom he had shared the apartment for the last three years, were staying with her mother in her mother's apartment in a neighboring building. The victim, his girl friend, and the children were to

---

**26.** A fourth ground, that the conviction was obtained by improper use a coerced statement (Ground Two), has been waived.

**27.** Section 2254(e)(1) states as follows:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the

burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). While there is some dispute as to whether certain other statements by the SJC are factual determinations subject to 2254(e)(1) and/or 2254(d)(2) (indicating that habeas relief may be granted with respect to claims that are "based on an unreasonable determination of the facts"), see *infra*, this preliminary background is unchallenged.

have moved to a new apartment on August 8. On the evening of August 7, the victim had supper with his girl friend and the children in her mother's apartment and then took the children to a park. They returned at about 7:30 P.M., and he left at about 8:20 P.M. At about 9:15 P.M. his girl friend telephoned Chalue's apartment. There was no answer. She called back twice in rapid succession. Chalue answered the third time, sounding as though he had been running and was out of breath. He said that he had been downstairs at the apartment of a neighbor. Then she heard someone walk into the kitchen and say something to Chalue, and she heard them both laugh. She testified that it was the "very soft voice" of a man. Then Chalue became silent. She asked him who was with him. Finally, he answered that it was "Johnny," the neighbor from downstairs. She asked him several times whether everything was all right. He kept responding, "[S]ure, why wouldn't it be?" Johnny Arel [the neighbor] testified at trial that he was not in Chalue's apartment, or indeed in the building, on the night in question.

Johnny's brother, Leo, who was staying in the fourth-floor apartment directly below Chalue's, testified that between 9 and 10 P.M. he heard someone going up the stairs; he went out to investigate, and spoke with Chalue, who was outside his own apartment and not within Leo's view. Leo then heard Chalue's front door close. Between midnight and 1 A.M. on August 8 he heard noises in Chalue's apartment as though furniture were being moved. A short time later he heard noises in the hallway and on the stairs outside his front door. When he turned off his radio and approached the door, the noise stopped. Leo was carrying a lantern, and its light was visible through his front door's transom. He heard the noise again twice, and, when he turned the radio off or approached the door, the noise stopped. A short time after the last noise, he heard the police cruisers arrive.

A cash register receipt for rum, cola, and ice was found, stained with blood, on the third-floor landing of the front stairs. The Commonwealth's fingerprint expert testified that he had found [Petitioner]'s fingerprints on the bottle of rum and on the partially empty bottle of cola. The Commonwealth's expert serologist testified that his tests indicated that four cigarette butts ... which had been taken from the ashtray on the victim's kitchen table had been smoked by someone who was a "non-secretor," i.e., who did not secrete blood group substances in his saliva. According to the expert's testimony, 20% of the population is composed of non-secretors. A test of [Petitioner]'s saliva showed that he was a non-secretor. Further, one of the four cigarette butts was found to contain cell material from a person with group B blood. [Petitioner] has group B blood. According to the Commonwealth's expert, 2% of the population are non-secretors and have group B blood.

A bloodstained knife was found on the dresser in Chalue's bedroom. The Commonwealth's expert serologist also testified that tests performed on the blood on the knife showed it to contain A and B antigens, which would be consistent with the blood being a mixture of blood of group A and blood of group B. The victim's blood type was group A. Similarly, a long-sleeved shirt found in a search of [Petitioner]'s apartment had a bloodstain containing both A and B antigens. Finally, group B blood was found on the gear shift and brake lever of

[Petitioner]'s automobile.[28]

When the police officers questioned [Petitioner] on the evening of August 8, he had a bandage on the palm of his right hand. The doctor who sutured the wound at about 8:20 A.M. on August 8 testified that in his opinion the wound had been between four and twenty-four hours old at the time he treated it. He testified that the wound could have been caused by the knife found in the victim's bedroom.

On August 8 at about 6:15 P.M. William McCarthy, captain of detectives with the Holyoke police department, dialed [Petitioner]'s telephone number, which he had found in the victim's address book next to the initials "W.H." [Petitioner] told McCarthy that it had been three or four months since he had last seen the victim, who had once been married to [Petitioner]'s sister. He said that he had had a telephone call from Chalue at about 7 P.M. the evening before, inviting him to a "get-together," but that he had declined the invitation because he had other plans for the evening. . . . McCarthy asked [Petitioner] if he would come to the police station sometime to talk with the police officers and possibly to help them in the case. [Petitioner] made an appointment to meet with McCarthy at the police station on the following day. About twenty minutes later [Petitioner] called McCarthy to ask whether he could come down to the station that evening, saying that he did not think he would be able to sleep that night "thinking about this." McCarthy agreed to the change.

. . . .

The [trial] judge found that [Petitioner] was accompanied to the police sta-

tion by his roommate, George Roy. [Petitioner] was ushered into McCarthy's office, and Roy was asked to wait outside. McCarthy began the interview by asking [Petitioner] the names of the victim's friends, what bars and cafes the victim had frequented, and related questions. Then [Petitioner] made the statement that he had taken Chalue the rum and cola, had spoken to him outside, and had returned home at about 10:15 P.M. McCarthy pointed out that this statement contradicted what [Petitioner] had told him on the telephone. [Petitioner] responded that he had not gone to the apartment and that McCarthy could verify that he arrived home at 10:15 P.M. by asking Roy. When McCarthy went out of the room to question him, Roy stated that on the way to the police station he and [Petitioner] had agreed to say that the defendant got home at about 10:15 P.M., but that it actually could have been 12:30 A.M.

*Id.*, 471 N.E.2d at 363–65.

Later in the interview, [Petitioner] told the police officers that after leaving Chalue he had gone to two "gay" bars in Springfield and had arrived home shortly after midnight. When asked by the police officers, he stated that he was a homosexual. At all times on the evening of August 8 [Petitioner] denied having gone into Chalue's apartment.

*Id.* at 365 (other footnotes omitted).

On September 11, 1980, a Hampden County grand jury returned a single indictment charging Petitioner with murder. A lengthy jury trial, presided over by Superior Court Judge Kent B. Smith, was held in March and April of 1981. A particular aspect of the trial, discussed more

**28.** According to the SJC: "The serologist, who had examined the gear shift and brake lever, testified that the blood on them was smeared in a way consistent with someone having held or operated them." *Id.*, 471 N.E.2d at 364 n. 3.

fully below, is that Judge Smith, on the third day of deliberations, responded to a mistrial motion by remarking to counsel that the trial was "so delicately balanced ... that even ... a small matter ... could tip the balance." (Document No. 49 ("4/7/81 Transcript") at 25.) The next day, April 8, 1981, the jury found Petitioner guilty of first-degree murder. Petitioner was thereafter sentenced to life in prison.

On July 15, 1981, Plaintiff filed a motion for a new trial, claiming extraneous influence on the jury foreman. (Further facts with respect to this issue are addressed below.) Since Judge Smith had by then been appointed to the Massachusetts Appeals Court, a new judge heard the motion and denied it on August 12, 1981. Petitioner appealed. In the meantime, Petitioner had filed a direct appeal as well as a second motion for a new trial based on juror taint. The appeals were consolidated by the SJC. On November 28, 1984, the SJC affirmed Petitioner's conviction and denied his motions for a new trial. *See Healy I*, 393 Mass. 367, 471 N.E.2d 359.

On April 11, 1997, Petitioner filed a third motion for a new trial in the Superior Court.[29] He also filed a motion for additional discovery. In response to that discovery request and a subsequent subpoena, the Commonwealth produced three reports prepared by Dr. H. Paul Wakefield, a pathologist at Holyoke Hospital, who had performed Chalue's autopsy on August 8, 1980, at the direction of the medical examiner. According to Petition-er, one of the reports had been provided in pretrial discovery, but the other two—described below as the "postmortem report" and the "note"—had not.[30]

On July 30, 1999, Petitioner amended his third motion for a new trial, arguing that the Commonwealth's failure to disclose the postmortem report and the note—which he labels "exculpatory and material" evidence—violated his federal constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Superior Court allowed Petitioner's request for an evidentiary hearing, but ultimately denied the amended motion for a new trial. On February 13, 2003, the SJC upheld the Superior Court's ruling, *Commonwealth v. Healy*, 438 Mass. 672, 783 N.E.2d 428 (2003) (hereinafter "*Healy II*"), issuing the following findings of fact which, again, are undisputedly entitled to a presumption of correctness pursuant to section 2254(e)(1).

> The reports from Dr. Wakefield ... consist of the following. Dr. Wakefield authored a four-page report dictated shortly after the August 8, 1980, autopsy and bearing the heading "Holyoke Hospital Pathology Department Post–Mortem Examination" (postmortem report). In the first paragraph of the postmortem report, Dr. Wakefield indicated that the victim's genitalia were "examined closely" and that "no evidence of marks of recent origin" were identified. The rectum was "similarly viewed revealing

---

29. That same day, he filed a federal habeas corpus petition, C.A. No. 97–30068–MAP, requesting a stay until such time as he had exhausted his additional claims in state court. On November 12, 1997, District Judge Michael A. Ponsor (declining to adopt this court's recommendation to the contrary) denied the motion for a stay, ruling instead that Petitioner would have twelve days to file a new petition following final adjudication of his new claims in state court.

30. In the interim, in 1994, the Superior Court had allowed Petitioner's motion for the release of certain exhibits for the purposes of DNA testing. According to Respondent, the exhibits were sent to a laboratory in California chosen by Petitioner. Neither party, however, has pursued any argument with respect thereto.

no abnormal findings on the external surface." The postmortem report went on to note that "[s]mears [were] made by use of a swab from both the mouth as well as rectum to be examined under the microscope." The next document at issue was a handwritten note (note) of Dr. Wakefield dated August 10, 1980, two days after the autopsy, reflecting the results of the microscopic examination of the oral and rectal smears: "Smears made from mouth and rectum fail to reveal spermatozoa present." The final document was a two-page report dated November 28, 1980, entitled "Autopsy Report," that included a subheading of "Final Diagnosis" (final diagnosis). The final diagnosis included the cause of death and gross anatomical description, but did not make any reference to examination of the victim's rectum and genitalia, the taking of any swabs or smears, or the results of any examination of swabs or smears.

In support of the amended motion for a new trial, an affidavit of trial counsel was submitted alleging that in preparation for trial he had received and reviewed the final diagnosis, but that he had not seen the postmortem report or the note and was not aware of the taking of any swabs. Following an evidentiary hearing on the issue of what items had been provided in discovery, the motion judge found that the hospital had forwarded both the postmortem report and the final diagnosis to the district attorney's office. However, the district attorney's office gave [Petitioner]'s trial counsel only the final diagnosis, not the postmortem report. The judge concluded that this failure on the part of the prosecutor was the product of inadvertence, not wilful misconduct. With respect to the note, the motion judge was unable to determine whether the hospital or Dr.

Wakefield had ever turned the note over to the district attorney's office, and hence did not find any form of prosecutorial misconduct with respect to the note. Notwithstanding the prosecutor's failure to provide [Petitioner's] counsel with the postmortem report, the motion judge held that [Petitioner] did not meet his burden of showing that the postmortem report was exculpatory or material. He therefore denied the motion for a new trial.

*Id.*, 783 N.E.2d at 432–33 (footnote omitted).

In its decision, the SJC accepted the motion judge's finding that neither the postmortem report nor the note were produced. *Id.* at 434 & n. 8. The SJC also found that, although "the note was [not] within the prosecutor's possession or control[,] . . . had the postmortem report been turned over to defense counsel, it would have alerted him to the fact that oral and rectal swabs had been taken for further examination, and competent counsel would presumably have followed up on that information and thereby obtained the test results that are reflected in the note." *Id.* at n. 8. "Thus," the court continued, "although the Commonwealth's obligation to turn over the documents did not extend to the note, the failure to produce the postmortem report effectively deprived [Petitioner] of access to the note." *Id.* Accordingly, while the "sole issue" before the SJC was "whether the evidence withheld by the prosecution [i.e., the postmortem report] would qualify as exculpatory and material such that the failure to produce it would constitute a violation of due process," the court "also examine[d] whether the note would qualify as exculpatory and material." *Id.* at 434 & n. 8. In the end, the court, "[h]aving reviewed the entire trial transcript," was "confident that, even if the prosecution had supplied the [postmortem]

report to [Petitioner] in timely fashion, the report or available evidence disclosed by it [i.e., the note] would not have influenced the jury." *Id.* at 438 (citations omitted).

Petitioner filed the instant habeas corpus petition on February 14, 2003, one day after the SJC's decision. The petition was originally drawn to Senior District Judge Frank H. Freedman and Respondent's answer was filed on July 1, 2003. On October 2, 2003, following Judge Freedman's untimely death, the case was redrawn to Judge Ponsor who, on October 14, 2003, referred the petition to this court for a report and recommendation. This court held a scheduling conference on November 5, 2003, and on February 5, 2004, over thirty volumes of transcripts were filed.

In the meantime, on December 1, 2003, Petitioner filed a memorandum in support of his petition as well as a motion for an evidentiary hearing on the issue of juror taint. In due course, Respondent tendered an opposition, Petitioner filed a reply brief, and the court heard oral argument. At oral argument, the parties discussed the fact that Petitioner's arguments with respect to Grounds One and Three cited only subsection (d)(1) of the habeas statute—which pertains to *legal* issues—but that it appeared that certain *factual* issues with respect to Ground One, the *Brady* claim, were being challenged pursuant to subsection (d)(2).[31] Accordingly, the court granted Petitioner leave to submit a supplemental brief addressing subsection (d)(2), which he did

on May 7, 2004. Respondent filed a supplemental opposition on May 25, 2004.

## II. DISCUSSION

The following discussion has three parts. First, the court will consider whether habeas corpus relief should be granted with respect to Petitioner's *Brady* claim (Ground One) pursuant to either subsection (d)(1) or (d)(2). Second, the court will analyze Petitioner's motion for an evidentiary hearing on the juror taint issue (Ground Four). Third, the court will address the sufficiency of evidence claim (Ground Three). In the end, the court will recommend that habeas corpus relief be granted with respect to Ground One pursuant to subsection (d)(1), that the district court should hold an evidentiary hearing with respect to Ground Four and, based on the current record, that Petitioner's sufficiency of the evidence challenge, Ground Three, be denied without prejudice.

### A. *Petitioner's Brady Claim (Ground One)*

In the state courts, as here, Petitioner asserted that the prosecutor's failure to disclose the postmortem report and the note violated his federal due process rights as delineated in *Brady*. To make such a *Brady*-based due process claim, a criminal defendant must demonstrate that (1) the government suppressed the evidence; (2) the evidence was favorable to the defendant because it was exculpatory or impeaching; and (3) the defendant was prej-

---

**31.** In full, section 2254(d) states as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable ap-

plication of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

udiced by the suppression. *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (citing *Brady,* 373 U.S. at 87, 83 S.Ct. 1194).

For habeas purposes, however, a further showing is required, the contours of which depend on the particular subsection of section 2254 under which the petitioner is proceeding. (See n. 6, *supra.*) To succeed under subsection (d)(2), a petitioner must demonstrate that the state court's *Brady* decision "was based on an unreasonable determination of the *facts* in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added). Under subsection (d)(1), a petitioner may make a *legal* challenge, namely, that the state court's decision was either "contrary to" *Brady* and its progeny or that the state court's decision "involved an unreasonable application of" *Brady.* 28 U.S.C. § 2254(d)(1). *See generally McCambridge v. Hall,* 303 F.3d 24, 35–36 (1st Cir.2002).

In the instant case, there is no argument on Petitioner's part that the SJC's decision in *Healy II* was "contrary to" clearly established *Brady* jurisprudence. *Compare McCambridge* 303 F.3d at 35. Rather, the parties' dispute centers on whether the SJC's decision was "based on an unreasonable determination of the facts" (subsection (d)(2)) or "involved an unreasonable application of" *Brady* and its progeny (subsection (d)(1)). The court will consider the dispute in that order.

### 1. Subsection (d)(2)

As described, habeas relief may be granted pursuant to subsection (d)(2) if the state court's *Brady* decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Subsection (d)(2) "applies exclusively to determinations of basic, pri-

mary, or historical facts." *Dolinger v. Hall,* 302 F.3d 5, 8 n. 5 (1st Cir.2002) (citation and internal quotation marks omitted). As the First Circuit has made clear, "basic, primary, or historical facts" are "facts in the sense of a recital of external events and the credibility of their narrators," *Sanna v. Dipaolo,* 265 F.3d 1, 7 (1st Cir.2001) (citation and internal quotations marks omitted), not "[i]nferences, characterizations of the facts, or mixed fact/law conclusions," *Trigones v. Bissonnette,* 296 F.3d 1, 6 n. 4 (1st Cir.2002) (citation and internal quotation marks omitted).

As described, Petitioner's *Brady* claim initially invoked only subsection (d)(1). Subsection (d)(2) was pursued only after a discussion as to certain "facts" at oral argument, following which the court allowed Petitioner to file a supplemental memorandum of law. In his supplement, Petitioner reiterated his original position: that he meant to challenge only "the SJC's characterization of the facts and not the historic facts themselves" and, therefore, that he believed that "he properly raised his issues [solely] under 28 U.S.C. § 2254(d)(1)." (Document No. 61 (hereinafter "Petitioner's Supplement") at 5.) Nevertheless, Petitioner argued "in the alternative, [that] the SJC's adjudication of [his] *Brady* claim requires relief under section 2254(d)(2)." (*Id.* at 7.) Having now considered the record which has been provided, the court believes that Petitioner's *Brady* claim is indeed a legal one which properly arises under the "unreasonable application" prong of subsection (d)(1), not a factual challenge subject to subsection (d)(2).

To explain, some further background is required. The sum and substance of Petitioner's *Brady* claim derives from the SJC's legal analysis in *Healy II.* There, the SJC held that there was no *Brady* violation because the postmortem report

and the note, had they been disclosed, "would not have influenced the jury." *Id.*, 783 N.E.2d at 438. In so holding, the court engaged in a "discussion," quoted here in its entirety: [32]

[Petitioner] overstates the factual import of the postmortem report and note when he argues that they would have contradicted the theory that the murder was connected with some form of sexual encounter. The absence of spermatozoa in the victim's rectum or mouth means only that any sexual activity that occurred had not resulted in ejaculation in or around those specific areas. Similarly, the absence of any "marks" or "abnormal findings" on the victim's genitals and rectum means only that any sexual activity that occurred had not been sufficiently forceful or forcible to have inflicted visible injury. There is a wide range of sexual activity, up to and including many forms of sexual assault, that leaves neither sperm nor signs of injury to sexual organs. The Commonwealth presented no evidence, and did not make any suggestion to the jury, concerning precisely what forms of sexual activity may have taken place, or at what point in that sexual activity the encounter had turned violent, and no such precision with respect to the nature of the posited sexual encounter was even remotely necessary to the Commonwealth's case. Thus, that Dr. Wakefield's examination had arguably eliminated a few specific types of sexual activity did not, in any sense, undermine the evidence suggesting that the stabbing had occurred during the course of some form of sexual encounter. We agree with the motion judge's conclusion that the postmortem report and note "would not have provided any more material information or raised any more doubts about the sexual nature of the crime."

Moreover, the theory that the murder had occurred during a sexual encounter was of significance to the case in only a narrow, limited sense. The Commonwealth did not even reference this theory in closing argument, except to counter one point raised during defense counsel's closing argument. In his closing argument, defense counsel had argued to the jury that, given the number of stab wounds and the extremely bloody crime scene, the perpetrator's clothes would have had extensive bloodstains. By comparison, although blood of the victim's type was found on [Petitioner]'s shirt, the amount was quite small. The prosecutor's closing argument responded to this defense argument by pointing out the distinct possibility that the perpetrator had no clothes on at the time of the stabbing:

"This man was stabbed seventeen times. Blood was going all over the place. Would it be logical, Ladies and Gentlemen, that the person who stabbed him could be covered with blood and would it necessarily follow, Ladies and Gentlemen, that that person be wearing any clothing? Now, you've seen the photographs, Ladies and Gentlemen. The one I just showed you, what kind of activity do you think was going on in that bedroom? Ask yourselves that. Don't leave your common sense at home. Does it necessarily follow, Ladies and Gentlemen, that that person who was with [the victim] had any clothes on at all? Could you infer, Ladies and Gentlemen, that he washed the blood off and walked through the bedrooms and walked into the kitchen and washed that blood off? [The victim] was

---

**32.** This lengthy quote is also relevant to the analysis below regarding subsection (d)(1).

naked except for pants below his knees. Do you think you can infer that this person was necessarily clothed that was with him in that bedroom?"

As indicated above, the Commonwealth's theory did not rely on evidence of any specific form of sexual activity, nor did the Commonwealth suggest any motive for the stabbing of the victim. The only way in which the sexual nature of the encounter had any significance was to establish the reasonable possibility that the perpetrator may have been naked, so that the jury would not attach undue importance to the fact that [Petitioner]'s shirt was bloodstained in only one small area. The absence of sperm in the victim's mouth or rectum, and the absence of signs of physical injury to his genitals or rectum, would not have detracted from the Commonwealth's suggestion that the perpetrator may well have been unclothed at the time of the stabbing.

[Petitioner] correctly points out that there was extensive reference at trial to [Petitioner]'s homosexuality. However, that issue was raised by [Petitioner]'s own explanation as to why he had initially lied to the police about his whereabouts on the night of the murder and why he had asked his partner to concoct a false alibi. [Petitioner] claimed that he had been reluctant to tell the police his true whereabouts because he had been at two "gay" bars. To illustrate the implausibility of this proffered explanation, the Commonwealth introduced evidence that [Petitioner] was openly homosexual, with no need or desire to conceal his sexual orientation. This evidence concerning [Petitioner]'s homosexuality had nothing to do with any theory how or why the murder had been committed, but was directed instead at the interpretation to be placed on what the Commonwealth had proffered as consciousness of guilt evidence.

As illustration of the minimal significance that the issue of the hypothesized sexual encounter played at trial, defense counsel's lengthy closing argument nowhere mentioned the fact that the Commonwealth had presented no physical evidence of any such sexual encounter. While [Petitioner] now protests that he would have made great use of the postmortem report and note had he had them at trial, he ignores the fact that, on the evidence presented at trial, he could have but did not register any criticism of the lack of evidence on this issue. We agree that, in the absence of the postmortem report and note, defense counsel would reasonably have refrained from cross-examining Dr. Wakefield on the absence of such evidence (for fear of eliciting some unforeseen harmful evidence). However, once the evidence was closed, defense counsel could have vehemently—and safely—argued to the jury that the prosecution had not presented any physical evidence from the victim's body to corroborate that sexual activity had preceded the murder. The Commonwealth had not presented any evidence of seminal fluid or sperm on the victim, or any evidence of forcible penetration. If, as [Petitioner] now contends, it was crucial to his defense that he cast doubt on the theory that there had been a sexual encounter, it is puzzling that he did nothing whatsoever to cast doubt on that theory with the evidence (or lack thereof) that was presented at trial. We are not confronted with a situation where an argument made at trial could have been made more forcefully if defense counsel had had the withheld evidence. Here, there was no such argument made at trial.

The only difference between the argument that could have been made at trial

and the argument that could have been made with the postmortem report and note was that the Commonwealth had looked for certain signs of sexual activity and not found those particular signs. If the absence of that particular evidence related to sexual activity had, in fact, been important to the defense, that absence would surely have been pointed out to the jury. Instead, [Petitioner]'s closing argument did not in any way contest the inference that the attack on the victim had occurred during the course of some unidentified form of sexual activity. What [Petitioner] now proffers as the "more plausible theory" to explain the condition of the victim's body—that he was "set upon by looters," "tied up simply to incapacitate and silence him," and that "he managed to wriggle free of his boots (possibly dislodging his pants) and was stabbed to prevent his getting away"—is a theory that could have been, but was not, presented to the jury.

As to [Petitioner]'s contention that the postmortem report and note would have helped him establish that the police investigation was biased, we reject the suggestion that mere examination and testing of the victim's body for signs of sexual activity somehow suggests police bias. From the condition of the victim at the crime scene—semi-naked, bound, pants pulled down, and genitals exposed—it would be reasonable for the police to consider and investigate the possibility that the murder had some connection to sexual activity.

Having reviewed the entire trial transcript, we are "confident that, even if the prosecution had supplied the report to [Petitioner] in timely fashion, the report or available evidence disclosed by it would not have influenced the jury." As such, we find no error in the judge's denial of [Petitioner]'s third motion for a new trial.

*Id.* at 436–38 (citations and footnotes omitted).

There are obviously several *factual statements* in the above discussion, e.g., that "[t]he Commonwealth presented no evidence, and did not make any suggestion to the jury, concerning precisely what forms of sexual activity may have taken place, or at what point in that sexual activity the encounter had turned violent." *See Id.* at 436–37. The focus of Petitioner's *Brady* claim, however, is on the SJC's *legal conclusion* that the "sexual encounter" was "of minimal significance" at trial, *id.* at 437. (Document No. 18 (hereinafter "Petitioner's Habeas Brief") at 24.) As Petitioner acknowledges, his challenge is directed not at "basic, primary, or historical facts" relevant to subsection (d)(2), but on "[i]nferences, characterizations of the facts, or mixed fact/law conclusions" under the "unreasonable application" prong of subsection (d)(1). It is to that provision, therefore, which the court now turns.

### 2. Subsection (d)(1)

With respect to Petitioner's "unreasonable application" challenge, there is no dispute that Petitioner has satisfied the first two *Brady* elements, namely, that (1) the prosecution suppressed the postmortem report (and by extension the note), albeit not intentionally, and that (2) the suppressed evidence would have been favorable to Petitioner. At issue, therefore, is the third *Brady* element, the question of materiality and prejudice. In particular, Petitioner argues that the SJC's decision—that he was not prejudiced by suppression of the immaterial evidence—was an "unreasonable application" of *Brady*. Respondent disagrees. The court believes that Petitioner has the stronger argument.

As a preliminary matter, however, the court rejects Petitioner's "police bias" argument, i.e., that the SJC unreasonably determined that the suppressed evidence would not have materially supported Petitioner's theory of police bias. To be sure, Respondent does not dispute "the fact that the police instructed [Dr. Wakefield] to conduct a microscopic search for signs of homosexual activity" or that the police were admittedly investigating a "sexual activity" connection. *Healy II*, 783 N.E.2d at 435, 438. In the court's view, however, the SJC's conclusion—that the suppressed evidence would not have helped demonstrate police bias—was a reasonable application of federal law. As the SJC itself stated, "[f]rom the condition of the victim at the crime scene—semi-naked, bound, pants pulled down, and genitals exposed—it would be reasonable for the police to consider and investigate the possibility that the murder had some connection to sexual activity." *Id.* at 438.

The court reaches a different conclusion, however, with respect to the core of Petitioner's *Brady* claim regarding the SJC's determination, quoted in detail above, that the "sexual encounter" itself was "of minimal significance" at trial. Petitioner attacks at least three aspects of this determination: (1) that the postmortem report and note "would not have provided any more material information or raised any more doubts about the sexual nature of the crime." *Healy II* at 436; (2) that the report and note also "would not have detracted from the Commonwealth's suggestion that the perpetrator may well have been unclothed at the time of the stabbing," *Id.* at 437; and (3) that the Commonwealth's "evidence concerning [Petitioner]'s homosexuality had nothing to do with any theory how or why the murder had been committed," *id.* (Petitioner's Supplement at 6.) On balance, the court agrees with Petitioner—and hence disagrees with Respondent and the SJC—that the prosecutor intentionally elicited a wide variety of evidence from which the jurors could infer that the victim was murdered because of his homosexual relationship with Petitioner and in the midst of homosexual activity with him. (See Petitioner's Habeas Brief at 26.)

As Petitioner points out, there is ample evidence that the prosecutor was pursuing a theory of the case based on Petitioner's alleged homosexual relationship and/or activity with the victim. For example:

● In preparing to pick a jury, the prosecutor asserted (1) that the jury had "a right to consider" the connection between Petitioner's homosexuality and the inferably "homosexual related murder" and (2) that the inference of "homosexual related murder" might be drawn from photographs of the victim. The photographs, introduced over Petitioner's objection, depicted the victim as he was found: with his hands bound, his mouth gagged, and his pants pulled down to mid-thigh, exposing his genitals and buttocks.

● The prosecutor introduced a pair of the victim's undershorts, found on his dresser, which bore semen stains consistent with the victim's blood type.

● Holly Bendickson, the victim's girlfriend, testified in the prosecution's case-in-chief about changes in the victim's "mood or personality" prior to the murder. For example, she noted (1) the fact that he had been "sort of picky and [she] couldn't seem to make him happy"; (2) his denial that he had been sleeping, bare-legged, on the bed after she had seen him there from outside the apartment; (3) his claim that he had been sleeping "dressed up" on the couch and that he "didn't want to talk about it"; and (4) his delay in answering her knock

at the back door during which time she heard the front door open and shut.

- Bendickson also testified that on the night of the murder, while speaking to the victim on the telephone, she overheard "a little laughter" and a "very soft man's voice" in the background and that the victim was evasive about who was with him.

- Charlene Breault, Bendickson's sister and the victim's neighbor, testified that he had recently made her wait at his back door for about ten minutes before answering and was "zipping up his pants" when he finally came to the door.

- Breault also testified that although she had been "cutting through" the victim's apartment for some time, he recently became angry with her for doing so.

- The prosecutor unsuccessfully tried to introduce testimony that the victim and Bendickson's sex life had deteriorated in the months prior to his death. He urged that the evidence would show that "during that period his sexual preference or amounts of sexual activity seemed to change and [that] ... he had questions about his own sexual identity." Evidence of the victim's sexual preference was relevant, the prosecutor argued, because of the "photographs of the body," the evidence of "semen in the underwear" and the evidence that Petitioner "is a homosexual."

- The prosecutor introduced evidence that Petitioner's telephone number was found in the victim's address book, discreetly identified only by his initials, "W.H.," and that a detective asked Petitioner "if he was a homosexual."

- There was evidence that a person, inferably Petitioner, bought rum and cola the night of the murder and told the clerk he "was going to a party."

- The prosecutor claimed that the killer "was nude when he did it" and, accordingly, objected to Petitioner introducing his unbloodied jeans as evidence.

- The prosecutor elicited cumulative, uncontested evidence that Petitioner was a homosexual living in a sexual relationship with another man and sleeping in the same bed.

- While probing whether Petitioner was a "closet homosexual," the prosecutor asked whether he had "any knowledge that Richard Chalue was bi-sexual" and whether or not Petitioner had "a relationship with Richard Chalue."

- In cross-examining Petitioner, the prosecutor attempted to introduce evidence that Petitioner owned a tee-shirt printed with the words "Sex Instructor, First Lesson Free."

(*Id.* at 26–28.)

Possibly the most striking indication of the prosecutor's homosexual or sex-based theory of the case is gleaned from his closing argument. In summarizing the evidence, the prosecutor directed the jurors' attention to Bendickson and Breault's testimony that the victim's behavior had changed just before his death. He also reminded the jury of the evidence that someone, inferably Petitioner, bought rum and cola the night of the murder and told the clerk he "was going to a party." Finally, he directed the jurors' attention to the photographs and asked: "[W]hat kind of activity do you think was going on in that bedroom?"; and "[W]ould [it] necessarily follow ... that that person be wearing any clothing?"; and "Do you think you can infer that this person was necessarily clothed that was with him in that bedroom?" Against this background, the alleged "sexual encounter" between Petitioner and the victim was anything but minimal in its significance at trial.

To be sure, the SJC, in *Healy II*, downplayed the prosecutor's closing remarks by

concluding that "[t]he only way in which the sexual nature of the encounter had any significance was to establish the reasonable possibility that the perpetrator may have been naked, so that the jury would not attach undue influence to the fact that [Petitioner]'s shirt was bloodstained in only one small area." *Id.,* 783 N.E.2d at 437. This comment, in this court's view, ignores the reality of the trial. As Petitioner points out, the SJC itself, nearly a decade earlier in *Healy I,* made numerous statements *emphasizing* the sexual nature of the crime and the prosecutor's pursuit of a homosexual or sex-based theory of the case. For example, the SJC ruled in *Healy I* (1) that "a question properly to be decided by the jury" was whether the photographs "suggested that the murder was in any way linked to homosexual activity"; (2) that the underwear evidence was "especially relevant, since it appears from the record that there was no underwear on the body"; (3) that Bendickson and Breault's testimony "tended to show that in the week before his death the victim had formed a relationship with someone other than his girl friend," the significance of which was "best left as a matter for the jury to decide"; and (4) that the prosecutor's closing argument, in essence, "insinuated a sexual or homosexual element to Chalue's murder" which was "fairly inferable from the evidence in this case." *Healy I,* 471 N.E.2d at 367–68, 373.

In a similar vein, the court believes that the SJC's statement in *Healy II* about "sexual activity"—that "[t]here is a wide range of sexual activity, up to and including many forms of sexual assault, that leaves neither sperm nor signs of injury to sexual organs"—fails to explain away the materiality of the suppressed evidence. Aside from the fact that the SJC did not identify a single example of such sexual activity, the crime scene, as Petitioner cogently asserts, "reeked of brutality and loss of control. Had the jurors heard Dr. Wakefield's expert observations—virtually ruling out ejaculation or any brutal or out-of-control sex involving the victims' [sic] genitals, anus or mouth—they [might] have doubted that he was party to any sexual acts they might have imagined." (Petitioner's Supplement at 9 (emphasis omitted).)

Of course, the mere fact that the prosecutor may have intended to infer that the victim was murdered because of his homosexual relationship with Petitioner and/or in the midst of homosexual activity does not, *a fortiori,* mean that suppression of the postmortem report and note was material and prejudicial for *Brady* purposes. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (holding that suppressed exculpatory evidence is deemed material and prejudicial "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different") (citations and internal quotation marks omitted). However, without a "homosexual" or a "sexual" element—which the postmortem report and note certainly tended to discount—Petitioner's motive was significantly lessened. Put differently, without his homosexual or sex-based murder theory, the prosecutor was left with a responsibly employed defendant who had no history of violence, no criminal record and no known animus against the victim. Accordingly, and with all due respect to the SJC, this court deems the postmortem report and note to be material and, thus, their suppression prejudicial to Petitioner's defense. *See Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair

trial, understood as a trial resulting in a verdict worthy of confidence.").

There is at least one other important, perhaps clinching, indicator that the absence of the postmortem report and note were prejudicial to Petitioner's defense. As Petitioner argues, the SJC ignored Judge Smith's stated view during jury deliberations that the trial was "so delicately balanced that even . . . a small matter . . . could tip the balance." (4/7/81 Transcript at 25.) Ignoring this statement, Petitioner argues—and the court agrees—is further evidence of the unreasonable application of *Brady* by the SJC.

The context surrounding Judge Smith's statement is important for purposes of this analysis. Jury deliberations spanned four days and consumed nearly thirty hours. On the first day, the jurors sought re-instruction on the issues of permissible inferences, reasonable doubt, and circumstantial evidence. When the jury had not reached a verdict by the end of that day, the prosecutor unsuccessfully moved for a mistrial. The prosecutor again moved for a mistrial on the third day of deliberations, this time because of the publication of a newspaper article in the *Holyoke Transcript* entitled "Friends Rally for Healy." This motion prompted Judge Smith to state, in no uncertain terms, that he too viewed it as an extremely close case:

> There is one thing I wish to point out, I don't think I have to point out to both sides, this is a very, very, very delicate trial. The Commonwealth's case on this trial consists of admissions allegedly made by Mr. Healy and inconsistent—in other words, it's entirely, purely circumstantial evidence, so it's right in the balance in the sense of this, when you have a circumstantial case like this, *I can't remember one in many years where a case is so delicately balanced than that even in a small matter, if the jury found out about it, it could tip the balance.*

(4/7/81 Transcript at 24–25 (emphasis added).) Musing on the questions he would ask jurors about the article, the judge again referred to "a case like this which is so delicate." (*Id.* at 27–28.) Finally, after speaking with all the jurors—and determining that no harm was done by the article—he once again noted this was a "difficult case" in a "delicate balance" and ordered the jurors sequestered. (*Id.* at 69.)

Petitioner's argument to the contrary, Judge Smith's observations, this court believes, are not factual determinations entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See, e.g., Sanna,* 265 F.3d at 7 (noting that subsection (e)(1)'s presumption of correctness standard applies only to "basic, primary, or historical facts"); *Weaver v. Thompson,* 197 F.3d 359, 363 (9th Cir.1999) (holding that statements in trial judge's letter to counsel were neither "facts" nor "findings of fact" and, thus, were not presumptively correct under subsection (e)(1)). Nevertheless, Judge Smith's observations support Petitioner's main proposition: that the suppressed evidence, which was favorable to Petitioner's case, was material enough to have swayed the jury to his side. In other words, even assuming *arguendo* that the SJC reasonably concluded that the postmortem report and note concerned an issue of "minimal significance"—e.g., a side issue having to do with the killer's nakedness—it unreasonably disregarded the trial judge's observation that the case was so close that even a "small matter" could have changed the outcome. Accordingly, and for the other reasons noted above, the court will recommend that habeas relief be granted Petitioner with respect to Ground One pursuant to the "un-

reasonable application" prong of 28 U.S.C. § 2254(d)(1).

### B. Petitioner's Motion for an Evidentiary Hearing (Ground Four)

Petitioner has not yet addressed the merits of the juror taint issue (Ground Four) but, instead, seeks an evidentiary hearing with respect thereto. Before addressing that request, some further background is in order.

As might be expected, Petitioner and Respondent offer somewhat contrasting versions of the facts surrounding the juror taint issue. Although there is little material difference in the parties' expositions, the court has chosen to follow Respondent's lead and take the SJC's statement of the facts on this question verbatim. As set forth in *Healy I*, those facts are as follows:

> During the trial it came to the attention of the prosecutor that the foreman of the jury, Paul L. Briere, might have been subjected to extraneous influences in the form of improper communications by a third person. The third person was a law student. Paul Ramy, who was employed by the same company as Briere. One of Ramy's fellow law students worked in the office of the district attorney; it was through him that the prosecutor learned that Ramy had made statements which indicated that he had been having conversations about the trial with the foreman.
>
> On April 2, 1981, just before closing arguments, the judge questioned the fellow law student, examined Ramy under oath, and also questioned the foreman. These sessions were held separately in the judge's lobby in the presence of counsel. Counsel were permitted to question the first two, and apparently to suggest questions to the judge to ask the foreman.

> Ramy testified that Briere had said that he had been made foreman; that many exhibits had been introduced and it had been a "very long day"; that it was a difficult case; that he hoped the jury would be able to bring a transcript to the jury room with them. When Briere was first empanelled, Ramy told him that he could not look at Ramy's evidence books. Briere never commented to Ramy on the evidence, asked him about the admissibility of evidence, or talked to him about what was going on in the courtroom.
>
> Briere stated that he had asked Ramy whether a jury were allowed to take a transcript of the trial into the jury room and that he had speculated to Ramey [sic] as to whether evidence was being questioned. He said, "The questions I asked were general in nature and have nothing to do with the specifics of the case." He denied having discussed the evidence, its admissibility or exclusion, or any other aspect of the case with Ramy. The judge instructed the foreman that he could consider only the evidence he heard in the courtroom and that he had to take the law from the judge. He told him to tell the rest of the jury that he had been in the lobby discussing scheduling with the judge. The judge also told Briere not to entertain a grudge against either side because he had been questioned. Briere resumed his seat on the jury. The record indicates no objection by either counsel.

After the verdict and sentencing, defense counsel reported to the judge that another lawyer, Mr. Greg T. Schubert, had told him that he heard from Paul Ramy that the judge had been in the jury room during deliberations. [The rumor was false.] Mr. Schubert also told defense counsel that Ramy and Briere had been living in the same apart-

ment during the trial. Neither Ramy nor Briere had revealed this fact to the judge on April 2.

As a result of questioning Mr. Schubert, on April 16 the judge conducted further questioning of Briere, Ramy, and the law student who worked in the office of the district attorney. Counsel had the opportunity to ask questions of all three men on this day. Briere stated, under oath, that because of marital problems he had been renting a room from Ramy during the period of the trial. He testified that he had told Ramy during the trial that he could not discuss the case with anyone. He had asked Ramy if the jury could see a transcript and what a "voir dire" was. Ramy had told him that he knew someone who was a spectator at the trial. Ramy had said that that person was known to him only as "Dick." Sometimes at night he would repeat "Dick's" comments to Briere. Briere "tried very hard to be stoic." At various points Ramy said that he heard that the defendant took the stand that day or that there had not been a trial another day. Defense counsel asked Briere if Briere had had a conversation with Ramy about the credibility of [Petitioner]'s testimony, along the line indicated by Ramy's statement to his fellow student. Briere replied, "No. I didn't."

Ramy's testimony on April 16 was consistent with his earlier testimony as to conversations he had had with Briere about the trial. However, it became clear on April 16 that Ramy had been evasive on April 2 about the fact that Briere was living with him. On April 16 Ramy was extremely evasive, to put it charitably, about what he had said and to whom he had said it relative to the judge's being in the jury room; during what period Briere was living with him; and whether he had told Briere about what had been

said at Ramy's first visit to the judge's lobby. Furthermore, Ramy was unable to give any more information about "Dick" other than that "Dick" was not a lawyer or a law student, that he had met "Dick" sixteen years before in a bowling league, and that he had had the conversation about the trial with him at a supermarket meat counter. He swore "[u]nequivocally," though, that "'Dick' was not Paul Briere."

The judge had referred to "Dick" as "mysterious" and said that defense counsel probably thought that "Dick" was Briere and would be perfectly right in filing a motion for a new trial. He had advised Ramy to get a lawyer and to return on another day. At the end of the hearing the judge asked Ramy to try to locate "Dick" and to bring him back to the court. The judge said. "[T]he only thing I'm interested in is quite frankly to make sure the verdict was not tainted by the outside news, or by any members of the jury .... So, bring in this guy 'Dick' ... if there is such a person because I want to make sure the verdict was not tainted in any way, shape or manner." He set a further hearing for April 28, but no further hearing was held.

*Healy I,* 471 N.E.2d at 373–75 (citation and footnotes omitted). Although Judge Smith set a further hearing for April 28, 1981, it was not held because he was elevated to the Massachusetts Appeals Court in the interim.

In his July 15, 1981 motion for new trial, which was assigned to Superior Court Judge William W. Simons, Petitioner alleged that Briere had been subjected to improper influences. In connection with that motion, Petitioner sought an evidentiary hearing. On August 12, 1981, Judge Simons denied Petitioner's request for an evidentiary hearing. Judge Simons found,

on the basis of his inquiries, that Judge Smith "was satisfied that ... he felt no need on the posture of the information that he had at that time to continue with anything further." (Document No. 53 (hereinafter "8/12/81 Transcript") at 25.) In Judge Simons' view, an evidentiary hearing was not to be used as an "investigatorial tool" and, at most, Petitioner could file a legal brief arguing that the verdict was tainted by improper juror contact. (*Id.* at 26–28.)

Petitioner did in fact file a legal memorandum on August 28, 1981, urging again that he should be allowed an evidentiary hearing on whether there had been improper contact with a sitting juror. Judge Simons denied the motion on September 8, 1981. As indicated, the SJC affirmed that ruling in *Healy I* and stated the following:

The denial of [Petitioner]'s first motion for new trial was proper. As the Commonwealth argued and as the judge stated at the August hearing, a motion for a new trial should not have been filed in the Superior Court during the pendency of [Petitioner]'s appeal from his conviction.

Although the trial judge had set a date for a further hearing that was never held, we see nothing in the record of the lobby conferences of April 2 and April 16 to necessitate a further evidentiary hearing. There was no testimony on either of those dates as to any extraneous influence on Briere. Even if it were assumed that Briere was "Dick" and that he did express to Ramy his views on [Petitioner]'s credibility, this does not constitute an extraneous influence on Briere. Additionally, the motion judge acted within his discretion, based on a review of the transcripts of the prior hearings, affidavits submitted, oral argument, and memoranda of law, in concluding that no further evidentiary

hearing was required. He also was within his discretion in ruling that the attempt to use the motion for a new trial as an investigatory procedure was improper.

*Id.,* 471 N.E.2d at 375 (citations and footnote omitted).

Presently, Petitioner seeks an evidentiary hearing in order to enable the court to decide the merits of Ground Four. A hearing is required, Petitioner asserts, because the state courts "never held the necessary hearing or produced the necessary factual findings, despite Petitioner's diligent effort to develop the facts." (Document No. 19 (hereinafter "Petitioner's Motion for Evidentiary Hearing") at 1–2) (citations and internal quotation marks omitted). For his part, Respondent makes two arguments as to why an evidentiary hearing is not required. First, Respondent contends that federal habeas courts cannot sit in judgment of a state court's hearings or investigatory procedures. Second, Respondent asserts that Petitioner is not entitled to a hearing under the AEDPA.

If Respondent's first contention were true—that habeas courts can never evaluate state court hearings or procedures— the writ would be entirely hollow. Of course, as the decisions Respondent cites emphasize, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). *See also Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) ("federal habeas corpus relief does not lie for errors of state law"); *Hamm v. Latessa,* 72 F.3d 947, 954 (1st Cir.1995) (similar, citing *Estelle* ). But those decisions make it equally plain that the fundamental role of the federal habeas court is "to decid[e] whether a conviction violated the Constitution, laws, or treaties of the

United States." *Estelle*, 502 U.S. at 68, 112 S.Ct. 475. *See Lewis*, 497 U.S. at 780–81, 110 S.Ct. 3092 (similar). *See also Hamm*, 72 F.3d at 954 ("The rule, then, is that a federal habeas court will not disturb the state courts' construction or application of state law unless it can be shown that such construction or application offends the Constitution or some (applicable) federal statute."). That is exactly what Petitioner is pursuing in Ground Four. Specifically, Petitioner alleges that (1) "third party communications with the jury foreman violated his rights to trial by an impartial jury and to be confronted with the witnesses against him" (Petitioner's Motion for Evidentiary Hearing at 1); (2) "[t]his allegation is 'controlled by the command of the Sixth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment' " *id.* (quoting *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966)); and (3) "[t]he essential tool for deciding such an allegation is an evidentiary hearing" *id.* (citing, *inter alia, Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)).

Respondent's second contention—that the AEDPA bars Petitioner from obtaining an evidentiary hearing—requires a somewhat more detailed analysis. In the end, however, the court finds this contention equally wanting.

The statutory provision upon which Respondent relies, 28 U.S.C. § 2254(e)(2), states as follows:

(2) if the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

 (A) the claim relies on—

 (i) a new rule of constitutional law, made retroactive to cases on collat-

eral review by the Supreme Court, that was previously unavailable; or

 (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Respondent asserts that the language of this subsection makes clear that Petitioner is not entitled to an evidentiary hearing. Petitioner, however, argues that subsection (e)(2) does not even come into play since he did not "fail[ ] to develop the factual basis of [his] claim."

In *Williams v. Taylor*, the Supreme Court determined that the language in the opening clause of subsection (e)(2)—failing to develop the factual basis of the claim—is triggered only if the petitioner lacked "diligence" in developing a claim in state court. *See id.*, 529 U.S. at 437, 120 S.Ct. 1479. If a petitioner was unable, despite diligent efforts, to develop his claim in state court, the Court reasoned, then subsection (e)(2) would not bar an evidentiary hearing in federal court. *See id.* In other words, a petitioner's motion for an evidentiary hearing will not be barred by subsection (e)(2) if the habeas court determines he was unable to develop the factual basis of his claim in state court despite diligent effort. This inquiry begs another: under what circumstances is a petitioner considered *unable* to develop a claim in state court?

Here, in arguing that he required a more extensive hearing in state court, Petitioner relies on *United States v. Gaston-Brito*, 64 F.3d 11 (1st Cir.1995), which, he claims, lists prerequisites to developing a

claim at the state level.[33] In the court's view, however, Petitioner's reliance on *Gaston–Brito* is not convincing. First, the court in *Gaston–Brito* was examining a *federal* district court's inquiry into allegations of improper jury conduct during a *federal* trial. *See id.*, 64 F.3d at 12. That is obviously not the situation here. Second, as Respondent notes, Petitioner's reliance on such a "list" challenges, in essence the state trial court's *procedure* in investigating his claim, a problematic stance on Petitioner's part because, as indicated, a federal habeas court cannot review state court determinations on state law matters.

Nonetheless, Petitioner fares well under *Williams* itself. There, the Supreme Court ruled that a habeas petitioner was not barred an evidentiary hearing by subsection (e)(2) where the trial record contained "no evidence which would have put a reasonable attorney on notice that [a juror]'s nonresponse [during *voir dire* ] was a deliberate omission of material information." *Id.*, 529 U.S. at 442, 120 S.Ct. 1479. The district court had found that "the factual basis of the claims was not reasonably available to petitioner's counsel during state habeas proceedings." *Id.* If an attorney does not have notice of a problem, the Supreme Court concluded, he is presumably unable to act diligently on that problem. *See id.* at 442–43, 120 S.Ct. 1479.

Here, too, material questions of fact central to Petitioner's claim remained hidden from his counsel, as examples, "Dick's" identity, the extent of the conversations between Briere and Ramy, and other evidence which might indicate that the verdict was tainted by outside influences. As the SJC itself stated in *Healy I*, "[o]n April 16 Ramy was extremely evasive, to

put it charitably, about what he had said and to whom he had said it relative to the judge's being in the jury room; during what period Briere was living with him; and whether he had told Briere about what had been said at Ramy's first visit to the judge's lobby." *Id.* 471 N.E.2d at 374.

Still, the court must determine whether Petitioner exercised "diligence" in seeking to have these questions answered. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams,* 529 U.S. at 437, 120 S.Ct. 1479. Diligence "does not depend ... upon whether [the petitioner's] efforts could have been successful," but on whether he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435, 120 S.Ct. 1479. In determining whether a petitioner has acted diligently, the court may ascertain whether, based on the information available to the petitioner's attorney while the matter was before the state court, a diligent attorney would or could have done more. *See id.* at 439, 120 S.Ct. 1479.

It is difficult to argue that Petitioner, through his attorneys, could have done more to develop his claim. He promptly filed a motion for a new trial—with Judge Smith's blessing, *see Healy I*, 471 N.E.2d at 375 ("The judge ... said that defense counsel ... would be perfectly right in filing a motion for a new trial.")—and sought an evidentiary hearing with respect thereto. When that request was denied, he filed a timely written objection. When the judge overruled that objection, Petitioner filed a pleading seeking findings of

---

**33.** Petitioner claims that *Gaston–Brito* requires "(1) 'a full investigation,' (2) a decision whether improper, prejudicial contacts took place, and (3) findings spelled out 'with ade-

quate specificity to permit informed appellate review.' " (Document No. 20 (hereinafter "Petitioner's Evidentiary Hearing Brief") at 10).

fact. None were made. He then filed a motion for a new trial in the SJC, but that motion was denied as well. In short, Petitioner continually made timely efforts to adjudicate the matter in the state courts.

To be sure, as Respondent now suggests, Petitioner, arguably, might have tried to interview individuals involved with the case in order to develop his claim more fully. However, the Supreme Court has never held that the failure to pursue all possible avenues of inquiry amounts to a lack of diligence. Further, and perhaps more importantly, Petitioner's attorneys were precluded by state law from interviewing Briere or the other jurors, absent leave of court. *See* Rule 3.5(d) of the Massachusetts Rules of Professional Conduct ("A lawyer shall not ... after discharge of the jury from further consideration of a case with which the lawyer was connected, initiate any communication with a member of the jury without leave of court granted for good cause shown.... In no circumstances shall a lawyer inquire of a juror concerning the jury's deliberation processes."). In the end, the court believes that Petitioner exercised adequate "diligence" in pursuing his claim in state court but was "unable" to achieve relief. The court concludes, therefore, that Petitioner is not barred by subsection (e)(2) from receiving an evidentiary hearing.

Of course, even though the court believes that Petitioner's request for an evidentiary hearing is not barred by subsection (e)(2), it must still look to whether he has a right to an evidentiary hearing under the standard set forth in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), *as modified by Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). *See Fryar v. Bissonnette,* 113 F.Supp.2d 175, 179 (D.Mass.2000). *Townsend* requires an evidentiary hearing in federal court unless the petitioner received a "full and fair" evidentiary hearing in state court during which the relevant facts were reliably found:

> Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Townsend,* 372 U.S. at 312–13, 83 S.Ct. 745 (footnote omitted).

In the court's view, the *Townsend* standard has been met here. First, as described, Petitioner never received an evidentiary hearing in state court. Second, and perhaps more importantly, the state court never made findings on certain relevant facts. For example, neither "Dick's" identity nor the extent of the communication between Ramy and Briere was ever explored. In addition, Ramy's evasiveness made suspect other portions of his testimony, *e.g.,* "what he had said and to whom he had said it relative to the judge's being in the jury room; during what period Briere was living with him; and whether he had told Briere about what had been said at Ramy's first visit to the judge's lobby." *Compare Fryar,* 113 F.Supp.2d at 179 (petitioner had no right to an evidentiary hearing under *Townsend* "because the facts underlying his claim of error were fully developed in the state proceeding"). Finally, as described, Petitioner's attorneys were precluded by applicable ethical rules from interviewing the jurors themselves.

In summary, the court concludes that, in accordance with *Williams,* subsection (e)(2)'s bar does not come into play and

that Petitioner is entitled to an evidentiary hearing under *Townsend*. Accordingly, the court will recommend that his motion for an evidentiary hearing on the issue of juror taint be allowed.

### C. Sufficiency of the Evidence (Ground Three)

Finally, with regard to Ground Three, Petitioner argues that the SJC's ruling in *Healy I* that there was sufficient evidence to convict was an "unreasonable application" of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), "whether, after viewing the evidence in a light most favorable to the prosecution, *any* rationale trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original). *See* 28 U.S.C. § 2254(d)(1).[34] To decide this claim, Petitioner argues, the court must review the "totality" of the evidence. *See Hurtado v. Tucker*, 245 F.3d 7, 17–18 (1st Cir.2001).

After considering the relevant records provided, and despite Judge Smith's observation that the case was close, the court believes there was sufficient circumstantial evidence to convict Petitioner of murder based on the record before the jury. To be sure, should this court's recommendations with respect to Grounds One and Four be adopted, the situation may markedly change. For example, the court cannot surmise how a jury might have been influenced if it learned of the postmortem report and the note. Nor is the court convinced that the trial was free from juror taint. As the record presently stands, however, the court believes that the petition ought not be granted on the basis of Petitioner's sufficiency of the evidence challenge. Accordingly, the court will recommend that the petition be denied, without prejudice, with respect to Ground Three.

### III. CONCLUSION

For the reasons stated, the court recommends that Petitioner's motion for an evidentiary hearing be ALLOWED, that the petition be GRANTED with respect to Ground One, and that the petition be DENIED, without prejudice, with respect to Ground Three.[35]

Sept. 9, 2004.

---

**34.** In particular, the SJC held as follows:

> The judge denied [Petitioner]'s motion, made at the close of the Commonwealth's case, for a required finding of not guilty. The standard of review is whether there was enough evidence in the case-in-chief, when taken in the light most favorable to the Commonwealth, that could have satisfied a rational trier of fact of each [essential element of the offense] beyond a reasonable doubt. Applying this standard, we think that the Commonwealth's evidence warranted the denial of [Petitioner]'s motion, especially considering the evidence as to the cigarette butts; [Petitioner]'s fingerprints on the rum and cola bottles; the cut on [Petitioner]'s hand and its age; the bloodstains on the knife, on [Petitioner]'s shirt, and in his automobile; and the blood-

stained receipt. We are mindful also of [Petitioner]'s statements at the police station which placed him with the victim a few hours before his death, and the inconsistency of those statements with his statement to McCarthy over the telephone. That inconsistency could have been interpreted as showing consciousness of guilt.

> It is well settled that a case may be submitted to the jury on the issue of a defendant's guilt on circumstantial evidence. This is not a case where, on all the evidence, the question of [Petitioner]'s guilt was left to conjecture or surmise.

*Healy I*, 471 N.E.2d at 370–71 (citations, footnote and internal quotation marks omitted).

**35.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States Dis-

United States District Court,
D. Puerto Rico.

trict Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court within ten (10) days of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.